# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re | Bankruptcy Case No. 23-10117-TWD |
| WIRELESS ADVOCATES, LLC, | |
| Debtor. | |
| | |
| _____ | Adversary No. _____ |
| DANIEL E. BRETTLER, JR. | |
| Plaintiff. | COMPLAINT FOR DECLARATORY RELIEF ALLOWING SECURED CLAIM AND INJUNCTIVE RELIEF DIRECTING ITS PROMPT PAYMENT TO AVOID ONGOING LOSS TO THE ESTATE |
| v. | |
| VIRGINIA BURDETTE, TRUSTEE; and T-MOBILE USA, INC., | |
| Defendants. | |

Plaintiff Daniel E. Brettler, Jr. ("Plaintiff" or "Brettler"), a secured creditor, alleges as follows:

### PARTIES

1. Plaintiff Brettler is an individual whose residence is 4124 55th Avenue East, Seattle, Washington 98105.

COMPLAINT FOR DECLARATORY RELIEF ALLOWING SECURED CLAIM AND INJUNCTIVE RELIEF DIRECTING ITS PROMPT PAYMENT TO AVOID ONGOING LOSS TO THE ESTATE - 1
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

2.    Defendant Virginia Burdette is the duly appointed Chapter 7 trustee (the "Trustee") for the estate of debtor Wireless Advocates, LLC, a Washington corporation (the "Debtor" or "WA") and with a business address of P.O. Box 16600 Seattle, Washington 98116.

3.    Defendant T-Mobile USA, Inc. ("T-Mobile") is a Delaware corporation with its corporate headquarter offices at 12920 - S.E. 38th Street, Bellevue, Washington 98006.

JURISDICTION AND VENUE

4.    On February 27, 2023, the U.S. Bankruptcy Court for the Western District of Washington (the "Court") issued an order for relief for the Debtor under Chapter 7 of Title 11 U.S.C. This Court has jurisdiction to adjudicate this complaint pursuant to 28 U.S.C. §§ 1334(a) and (b); 28 U.S.C. §§ 157(a) and (b); 28 U.S.C. §2201(a) and 11 U.S.C. §§ 105, 502(a) and 506(a) and Bankruptcy Rules 7001(1), (2), (7) and (9) and 7065. The United States District Court for the Western District of Washington has referred this matter to the Bankruptcy Judges of this District pursuant to General Rule 7 of its Local Rules. The claims asserted and relief requested in this complaint constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(K). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. §1409(a). Plaintiff consents to the entry of final orders by this Court.

FACTS

5.    Brettler formed the Debtor as a Washington corporation on or about July 15, 2004. In that same year, WA and Costco Wholesale Corporation ("Costco") entered into a Special Program Agreement (the "Costco Agreement"), under which WA became the exclusive authorized vendor to sell wireless devices, network services and related accessories to Costco members (the "Members") in self-contained kiosks located at various Costco warehouse stores. The program was eventually expanded to include virtually all of Costco's warehouse stores in the United States and Puerto Rico (the "Costco Program"). Under the Program and pursuant to the Costco Agreement, WA and Costco split the profits from sales on a quarterly basis, pursuant to an agreed upon formula set forth in the Costco Agreement.

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 2
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

6.     In addition to selling phones at Costco, WA also had a contract (the "AAFES Contract") with the United States Army and Airforce Exchange (the "AAFES") to sell phones at kiosks located at various Army, Airforce Navy and Marine post exchanges. Under the AAFES Contract, WA paid AAFES a percentage of its gross sale.  This segment of WA's business accounted for a relatively small percentage of WA total gross sales revenues (typically around 10%).

7.     In the early years, the Costco Program generated substantial profits.  Starting in 2016, however, the major wireless network carriers and the wireless industry as a whole changed the way phones and rate plans were sold.  The profits from sales of handsets and rate plans, which prior to 2017 had been increasing year over year, flattened and then eroded over time due to (1) the increased cost of the phones, resulting in consumers replacing their handsets and updating their rate plans much less often; and (2) despite the increased costs of headsets, competitive pricing pressure on handsets that eroded the profit margins on sales.

8.     In 2018, WA experienced its first operating loss.  Thereafter, various market and external factors--including without limitation, failed cell phone launches, COVID-19 business interruptions and supply chain issues--rendered the Costco Program increasingly less profitable.  These factors also negatively affected the margins on WA sales through the AAFES exchanges.

9.     In July 2022 and the months following, Costco invited Brettler to a series of meetings at its Issaquah, Washington headquarters and verbally informed Brettler of its desire to terminate the Costco Agreement and discontinue WA as Costco's authorized vendor for wireless phone and rate plan sales (the "Informal Notice").  However, under the last amendment to the Costco/WA program, Costco had previously agreed to provide 12 months of written prior notice before terminating the Costco Agreement.  At these meetings, Costco therefore informally discussed with Brettler the various options for a consensual and more rapid orderly termination and winding up of the Costco Program and liquidation of WA before Costco's issuance of a formal notice of termination.

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

10.     In August 2022, Brettler disclosed and informed U.S. Bank, its line of credit banker, of the Informal Notice, based on the assumption that even an informal, unwritten notice of Costco's intent to terminate the Costco Contract could still arguably be construed as a "Material Adverse Change" under the governing Credit Agreement, dated as of May 1, 2019, as amended (the "Credit Agreement") and therefore a reportable Event of Default under that agreement.  Shortly thereafter, U.S. Bank advised Brettler that it had transferred the administration of the WA loan to its special credits department.  As a result of these events, WA management became increasingly concerned that even if Costco did not elect to issue a formal notice of termination in the coming days, U.S. Bank could still in its discretion and at any time issue a notice of an Event of Default based upon the Informal Notice as a "Material Adverse Change."  Following such a notice of default, U.S. Bank could demand immediate payment of the $30.0 million line of credit balance (the "LOC Loan"), sweep the Debtor's bank account and thereafter refuse to make any additional advances, thus leaving the company's current payroll, benefits and tax obligations unfunded.

11.     Given the large number of employees required for WA's operations, payroll was a substantial, bi-monthly funding obligation of approximately $7.0 million.  As the discussions regarding how best to wind up the Costco Program and WA's business affairs continued between WA and Costco, WA focused on the company's financial circumstances, challenges, and objectives, including how best to a) reduce its workforce; b) retain the senior management employees necessary to conduct an orderly wind down and liquidation that would maximize the liquidation value of its remaining assets for the benefit of its creditors; and c) maintain sufficient cash resources to pay timely and in full the U.S. Bank LOC Loan as well as employee wage claims and related taxes.  Brettler advised the Debtor's Board of Managers of these circumstances, challenges, and objectives and the Board authorized a) the indemnification of critical senior management employees; b) Brettler making such personal secured loans to the Debtor as would be needed to fund payroll and other liquidation expenses to achieve these goals; and c) the Debtor filing of an ABC receivership or a voluntary bankruptcy case, whichever Brettler (with the

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 4
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

assistance of WA's advisors) should determine to be in the best interests of the company and its creditors.

12.     WA thereafter explored with U.S. Bank what terms it might require for the waiver of certain negative covenants prohibiting Brettler from personally loaning such funds as might be needed to shore up the company's deteriorating cash flow as it pursued an orderly liquidation.

13.     At this juncture, China had not yet curtailed its cell phone manufacturing operations due to the spreading COVID-19 epidemic there and the Debtor hoped the new iPhone 14 would still launch in the 4th quarter, thereby generating more positive sales results as part of a liquidation and winding up than could be achieved through a peremptory forced shut down and liquidation. For its part, Costco strongly preferred that WA's shut down of the Costco Program occur after the 2022 Christmas selling season, not before. In the meantime, however, the Debtor's erratic cash flow remained of considerable concern, and Costco and the company discussed how emergency funding, over and above the amount of any Brettler personal secured loans, might be made available from Costco, despite the prohibitions on loan funding in the Credit Agreement. To assist the company's cash flow, the parties agreed to suspend all payments due to one another under the Costco Agreement but notwithstanding Costco's operational preference to avoid the disruptions to its Christmas season operations from the Debtor's cessation of operations. Costco remained uninterested in acquiring WA or making any secured loan advances itself to sustain WA's operations through the first quarter of 2023.

14.     Due to Costco curtailing Wireless's purchases of Costco-owned inventory and supply issues related to the new Apple iPhone, it became clear that the Debtor's December 2023 sales would be insufficient to offset the projected additional operating losses from continued 4Q 2023 operations, as requested by Costco. Costco categorically declined to make any such loan advances itself to cover what the Debtor estimated would likely be an approximately $5.0 million potential operating loss in December alone if it did not immediately cease operations.

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 5
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

15. Therefore, on December 2, 2022, and as required by the "resting period" obligations set forth in the Credit Agreement and its third amendment, U.S Bank swept WA's account bringing the LOC Loan balance down to $0. WA then terminated the U.S. Bank Credit Agreement. With that paydown, the Debtor had insufficient funds to pay kiosk employees their final wages and the other wages owed headquarters employees necessary to conduct its liquidation. Therefore, on that same day, December 2, 2022, Brettler advanced a $6,172,412.00 personal; secured loan in order to insure funding for these payroll obligations. The amount advanced on this Brettler secured loan (the "Brettler Secured Loan") was based on WA's projected payroll, which required wires days in advance of the next scheduled payroll payments on December 9, 2022.

16. True and accurate copies of the Brettler Secured Loan documents (the "Brettler Loan Documents") are collectively attached hereto as Exhibit A, including:

- Brettler Junior Secured Loan Agreement, dated as of December 1, 2022 (the "Brettler Loan Agreement")

- Brettler Secured Line of Credit Note, dated as of December 1, 2022 (the "Brettler Note")

- Brettler Security Agreement, dated as of December 1, 2022 (the "Brettler Security Agreement")

- UCC-1 Financing Statement No. 2022-227-6099-5, dated August 15, 2022 and filed with Washington's Department of Licensing (the "Brettler UCC-1").

17. Defendant T-Mobile has filed one or more UCC-1 financing statements with Washington's Department of Licensing, naming WA as debtor and describing as collateral certain T-Mobile property purchased by WA from T-Mobile (i.e. T-Mobile equipment, handsets and prepay products, including E-Coupon PINS and Prepay Cards) and all of WA's rights to receive payments from T-Mobile (collectively, the "T-Mobile Collateral").

18. On December 6, 2022, WA repaid Brettler $1,217,805.00 of the Brettler Secured Loan when it was discovered that the payroll payment due on December 6, 2022 would not be as

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 6
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

large as originally projected. Later that day, the payroll processor (UKG) drew $4,672,607.33 from the WA payroll account in three separate draws, thereby insuring funding for the company's payroll. On December 7, 2022, UKG drew $380,449.54 to pay the payroll taxes associated with the payroll draw and later that same day, WA executed and filed its Assignment for the Benefit of Creditors with the King County Superior Court.

19.    On December 7, 2022, prior to making is assignment for the benefit of creditors to the Stapleton Group as receiver, WA terminated all its field employees providing retail services in the Costco Warehouses and at the various military exchanges. When the field employees were terminated, the Brettler Secured Loan made it possible for the company to pay each employee current at their termination through their last date of employment.

20.    The Brettler Loan Documents provide for a contract rate of interest at 8% per annum, plus a default rate 5% above that amount, and authorize Brettler to recover attorneys' fees and costs incurred in enforcing his rights to payment.

21.    The Brettler Loan Documents create an allowable, valid and perfected first priority secured claim in favor of Brettler (the "Brettler Secured Claim"), secured by substantially all of the property of the Debtor (the "Brettler Collateral"), including without limitation the cash collateral (the "Cash Collateral") held by the Trustee on behalf of the WA Chapter 7 estate. This Brettler Secured Claim includes not only the Brettler Secured Loan amounts owing but also a) certain unpaid pre-petition and post-petition wage amounts plus 12% interest thereon pursuant to Chapter 19.52 RCW; and b) any unliquidated and contingent indemnification amounts which may arise in the future and be owing from WA to Brettler as an indemnitee under applicable law and/or the terms of WA's Limited Liability Company Agreement, dated as of July 15, 2004, as amended.

22.    On or about April 14, 2023, the Trustee and Brettler entered into that certain Stipulation Authorizing Adequate Protection and Use of Cash Collateral Pursuant to Sections 361 and 363 of the Bankruptcy Code (Dkt. No. 176, the "Stipulation") and thereafter on May 1, 2023 the Court entered its Order Approving Stipulation and Authorizing Use of Cash Collateral Pursuant

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 7
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

to Sections 361 and 363 of the Bankruptcy Code. Dkt. No. 219. The Stipulation expressly reserves Brettler's right to bring this Complaint and the Court's jurisdiction to "determine, allow and direct payment of any amounts claimed by Brettler as part of the Brettler Secured Claim."

23. To date, Brettler has received no payments on the Brettler Secured Claim and the principal amount that remains owing on the Brettler Secured Loan is $4,982,195.00. On or about May 22, 2023, Brettler filed a true and correct proof of claim setting forth the amounts owing to him under his Brettler Secured Claim as of the January 23, 2023 (the "Petition Date"), a copy of which is attached hereto as Exhibit B.

24. On the Petition Date, the value of the Brettler Collateral (including the Cash Collateral but excluding the T-Mobile Collateral, if any) far exceeds the principal amount of the Brettler Secured Claim. As an oversecured creditor, Brettler is therefore entitled to allowance and payment of accruing interest and his reasonable attorneys' fees and costs as part of his Brettler Secured Claim.

25. Since the Petition Date, interest on the principal amounts and attorneys' fees and costs have continued to accrue. As of May 19, 2023, the amounts due on the Brettler Secured Claim (exclusive of attorneys' fees) total $5,135,174.90, broken out as follows:

Principal Balance on Brettler Note:          $4,954,607.00

Unpaid Accrued Interest on Brettler Note:     $180,567.90

In addition, per diem interest of $1,101.02 continues to accrue on the principal amount of the Brettler Secured Claims until they are paid

26. The Trustee holds Cash Collateral in excess of $7.0 million at this time. None of this Cash Collateral constitutes proceeds of T-Mobile Collateral and Brettler alone holds a valid and perfected first priority security interest in this Cash Collateral. As of the date of this Complaint, it is unclear whether and when the Trustee will succeed in substantially increasing the amount of Cash Collateral from her liquidation efforts. In the meantime, the administrative costs in the WA Receivership and this Chapter 7 case continue to mount, posing the potential for this

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 8
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1  Chapter 7 estate to become administratively insolvent.  Moreover, this Chapter 7 estate continues

2  to be diminished daily by the accrual of interest and attorneys' fees and costs on the Brettler

3  Secured Claim.  Good cause therefore exists for this action to be adjudicated on an expedited basis

4  and for the Court to declare the Brettler Secured Claim an allowed first priority claim, directing

5  the Trustee to immediately pay it from Cash Collateral.

FIRST CLAIM FOR RELIEF

Declaratory Relief Allowing Brettler Secured Claim

8        27.      Plaintiff incorporates the allegations contained in ¶¶1-26 above.

9        28.      Pursuant to 28 U.S.C. §2201(a) and 11 U.S.C. §§502 and 506, Plaintiff is entitled

10  to a declaratory judgment declaring, determining and allowing the Brettler Secured Claim in the

11  amounts set forth above together with a specific findings that a) Brettler holds a valid and perfected

12  first priority security interest in the Brettler Collateral (excluding the T-Mobile Collateral, if any)

13  and in the Cash Collateral; and b) Brettler holds a valid and perfected security interest in the T-

14  Mobile Collateral, which is first in priority except to the extent of the amount, if any, of any senior

15  security interest held by T-Mobile in such T-Mobile Collateral.

16        29.      Such declaratory judgment should include a finding that a) the value of the WA

17  Chapter 7 estate's equity interest in the Brettler Collateral continues to diminish as interest and

18  attorneys' fees and costs continue to accrue on the Brettler Secured Claim; and b) it is therefore in

19  the best interests of this Chapter 7 estate for the Trustee to promptly pay the Brettler Secured Claim

20  in full from the Cash Collateral.

SECOND CLAIM FOR RELIEF

Injunctive Relief Directing Payment of Brettler Secured Claim

23        30.      Plaintiff incorporates the allegations contained in ¶¶1-29 above.

24        31.      Pursuant to 28 U.S.C. §§105 and Bankruptcy Rule 7065, and following the Court

25  awarding the foregoing declaratory relief, Plaintiff is entitled to an injunction directing that without

26

27

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 9
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1 further delay the Trustee shall pay Brettler the full amount of the Brettler Secured Claim from the

2 Cash Collateral.

## PRAYER FOR RELIEF

4 Based upon the foregoing allegations in this Complaint, Plaintiff respectfully requests this

5 Court enter the following relief:

6 A. Pursuant to 28 U.S.C. §2201(a) and 11 U.S.C. §§502 and 506, a declaratory

7 judgment declaring, determining and allowing in full the Brettler Secured Claim in the amounts

8 set forth above together with a specific findings that 1) Brettler holds a valid and perfected first

9 priority security interest in the Brettler Collateral (excluding the T-Mobile Collateral, if any) and

10 in the Cash Collateral; and 2) Brettler holds a valid and perfected security interest in the T-Mobile

11 Collateral, which is first in priority except to the extent of the amount, if any, of any senior security

12 interest held by T-Mobile in such T-Mobile Collateral.

13 B. Pursuant to 28 U.S.C. §2201(a) and 11 U.S.C. §§502 and 506, a declaratory

14 judgment finding that a) the value of the WA Chapter 7 estate's equity interest in the Brettler

15 Collateral continues to diminish as interest and attorneys' fees and costs continue to accrue on the

16 Brettler Secured Claim; and b) it is therefore in the best interests of this Chapter 7 estate for the

17 Trustee to promptly pay the Brettler Secured Claim in full from the Brettler Cash Collateral.

18 C. Pursuant to 28 U.S.C. §§105 and Bankruptcy Rule 7065, an injunction directing

19 that without further delay the Trustee shall pay Brettler the full amount of the Brettler Secured

20 Claim from the Cash Collateral.

21 D. An award of all attorneys' fees and costs incurred by the Debtor in bringing this

22 action, as allowed by law and/or equity.

23 E. An award of such other and further relief as this Court deems just and equitable.

24

25

26

27

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

Dated at Seattle, Washington this 24th day of May 2023.

KARR TUTTLE CAMPBELL

By: _____
Bruce W. Leaverton, WSBA # 15329
Michael M. Feinberg, WSBA #11811
701 Fifth Ave, Suite 3300
Seattle, WA 98104
Phone: 206-223-1313
E-mail: bleaverton@karrtuttle.com
　　　　mfeinberg@karrtuttle.com
*Attorneys for Daniel E. Brettler, Jr.*

COMPLAINT FOR DECLARATORY RELIEF
ALLOWING SECURED CLAIM AND INJUNCTIVE
RELIEF DIRECTING ITS PROMPT PAYMENT TO
AVOID ONGOING LOSS TO THE ESTATE - 11
#1321067 v1 / 73569-002

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

Exhibit A

# JUNIOR SECURED LOAN AGREEMENT

## (Wireless Advocates, LLC)

This JUNIOR SECURED LOAN AGREEMENT (this "Agreement") dated as of December 1, 2022 is between WIRELESS ADVOCATES, LLC ("WA" or the "Borrower") a Washington limited liability company, and Daniel E. Brettler ("Brettler" or the "Junior Lender"), a Washington limited liability company. WA and Brettler are the "Parties" and each a "Party."

## I.     Recitals.

A.     WA is a limited liability company organized under the laws of the state of Washington, with its principal place of business at 400 Fairview Avenue North, Seattle, Washington 98109.

B.     Brettler resides at 4124 55th Avenue East, Seattle, WA 98105 and is the majority shareholder of Car Toys, Inc., a Washington corporation ("CT"), which is in turn the majority member of WA.

C.     U.S. Bank, N.A. (the "Senior Lender") is the senior secured lender to Borrower under that certain line of credit loan, dated as of May 1, 2019 (the "U.S. Bank Secured Line of Credit") and the holder of a valid and perfected first priority security interest (the "Senior Lien") against the "WA Collateral," as defined below.  The Senior Lien is governed by the various promissory notes, loan agreements, security agreements and other documents, all as amended from time to time, including without limitation, that certain Unlimited Guaranty of Brettler in favor of Senior Lender (collectively, the "Senior Secured Loan Documents").

D.     WA is the owner and operator of a wireless cell phone business conducted at various stores owned and operated by Costco Wholesale Corporation ("Costco") or by the U.S. military at various military installations (the "Military").  WA's wireless cell phone business has been hampered by the COVID-19 pandemic, supply chain issues, the global scarcity of micro-chips, a series of unsuccessful or deferred new wireless cell phone product launches, shrinking gross sales margins on wireless phones and carrier network contracts, and various other market factors resulting in its inability to conduct profitable operations and distribute dividends to its members.

E.     Costco has indicated intends to terminate its agreement with WA under its agreement relating to WA's wireless telephone sales and services at Costco stores.  Costco and WA have been attempting, without success to negotiate an amendment to their agreement to provide for the orderly wind down of the relationship provided for in their agreement.

F.     WA's wireless cell phone operations are not sustainable given current market conditions and without the ongoing and uninterrupted sales of phones and network services through Costco.  Accordingly, WA has notified Senior Lender of its planned curtailment and eventual total cessation of operations at Costco and Military stores.

1

G. WA intends to pay off the Senior Lender under the U.S. Bank Line of Credit (the "Senior Secured U.S. Bank Debt") and terminate the Senior Secured U.S. Bank Debt at or about the time of of entering into this Agreement. This Agreement is intended to permit WA to fund employee payroll obligations, including without limitation, wages, salaries, benefits and payroll taxes, and to fund other expenses necessary to curtail its operations.

H. Junior Lender, Borrower, and certain officers of Borrower (the "Individual Indemnitees") have entered into that certain Indemnity Agreement, dated as of August 19, 2022 (the "Indemnity Agreement").

I Subject to the terms and conditions of this Agreement, the Brettler Secured Line of Credit Note, the Brettler Security Agreement and other related instruments and documents (collectively, the "Junior Secured Loan Documents"), Junior Lender may, in his sole discretion and without obligation of any kind whatsoever, elect from time to time to advance funds to Borrower (the "Junior Advances" and each a "Junior Advance"), as may be necessary to fund the curtailment of WA's operations and to provide for the orderly liquidation of its assets. Junior Lender's Junior Advances shall be secured by security interests in substantially all the existing and future acquired assets of WA (the "WA Collateral") but such security interests shall be junior in priority to the Senior Lender's security interests in the WA Collateral.

## II. **Agreement.**

NOW THEREFORE, based upon the mutual agreements and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Junior Lender, intending to be legally bound, hereby agree as follows:

1. Brettler Junior Secured Line of Credit Loan.

1.1 Discretionary Advances on  Brettler Junior Secured Line of Credit Loan. Subject to the terms and conditions of this Agreement, and in his sole discretion and without obligation of any kind whatsoever, Junior Lender may make one or more discretionary Junior Advances from time to time. This credit line shall be evidenced by the Borrower's promissory note (the "Junior Secured Line of Credit Note"), payable on demand, and in the original face amount of the initial Junior Advance should Junior Lender elect to make such an initial Junior Advance. The Junior Secured Line of Credit Note may be increased, amended and restated from time to time, should Junior Lender, in his sole discretion, elect to make not only an initial Junior Advance but one or more additional Junior Advances.

1.2 Interest Rate on Junior Secured Line of Credit Loan. Interest shall accrue at 8.0 percent per annum (the "Contract Rate Interest") on the principal amounts of all Junior Advances under the Junior Secured Line of Credit Note and on the principal amount(s) of any other "Obligations" owed Junior Lender, as that term is defined in the Junior Secured Loan Documents. Upon an Event of Default, additional Default Rate Interest at 5 percent per annum shall also automatically accrue on all such principal amounts.

2

1.3     Demand Obligations.  Subject to the terms and conditions of the Senior Secured Loan Documents governing the payment priority of Senior Secured U.S. Bank Debt, Borrower shall pay to Junior Lender upon his demand all principal, interest and other amounts owing Junior Lender on the Obligations owed to Junior Lender.

1.4  Collateral.  The Junior Line of Credit Loan shall be secured by the WA Collateral.

1.5     Prepayment.  Upon payment in full of the U.S. Bank Senior Secured Line of Credit Loan, the Borrower may prepay the Junior Secured Line of Credit Loan in full or in part at any time without penalty.  Any prepayment will be applied first against expenses and indemnities due hereunder; secondly, against interest due on principal amounts; and thereafter against principal.

1.6     Loan Payments.  All payments by the Borrower on the Junior Secured Line of Credit Loan shall be made in U.S. Dollars and in immediately available funds.

1.7     Use of Funds.  Junior Advances under the Junior Secured Line of Credit Loan shall only be used to defray the following costs:

(a)  employee payroll obligations, including without limitation, wages, salaries, benefits and payroll taxes;

(b) other expenses approved by Junior Lender necessary to curtail WA operations, including the payment of professionals as approved or authorized by Brettler;

(c)  the defense and prosecution of claims and counterclaims pending before the Superior Court of the State of Washington for King County, in Tylt, Inc. vs. Wireless Advocates, LLC, Case No.   20-2-07407-1 SEA (the "Pending Litigation").

1.8     Conditions to Junior Advances.  This Section 1.8 shall govern Junior Advances under the Junior Secured Line of Credit Loan.  Each Junior Advance shall be conclusively deemed to have been authorized and made at the request of and for the benefit of the Borrower when it is credited to any deposit account of Borrower or when such Advance is funded in accordance with the instructions of the Authorized Officer of WA (as defined by resolution of the Board of Managers of WA).

a.     General Conditions to Junior Advances.  Each discretionary Junior Advance requested by Borrower shall be in writing and shall state the amount and purpose of the requested Junior Advance, certifying that each of the following conditions to the requested Junior Advance have been satisfied:

i.     All conditions to closing set forth in Section 6 have been met;

ii.     The Junior Lender and the Authorized Officer of WA have approved and authorized the requested Junior Advance;

iii.     No Event of Default exists under this Agreement or the Junior Secured Loan Documents and no event or circumstance then exists which

3

with notice, the passage of time or both would constitute a default under any of the Junior Secured Loan Documents;

iv.     Junior Lender is not prevented from making advances under the Senior Secured Loan Documents, any applicable law, court order, agreement or otherwise;

v.      No legal or administrative proceeding exists challenging the validity of or seeking to enjoin, set aside, review or otherwise challenge, Junior Lender's security interests securing the Junior Secured Line of Credit Loan; and

vi.     Other than the Pending Litigation, no lawsuit or lawsuits have been filed following the date of this Agreement on behalf of one or more parties against Borrower claiming in an aggregate amount One Hundred Thousand Dollars ($100,000.00) or more in excess of any insurance coverage, and/or which interferes with or threatens to interfere with Borrower's material obligations hereunder.

Unless otherwise agreed by Junior Lender, Junior Advances shall only occur if all the foregoing conditions are met to Lender's satisfaction (or Junior Lender has waived such requirement in writing), and Junior Lender, in its sole discretion and without obligation, shall have elected to make any such Junior Advances requested by Borrower.  Junior Lender, in his sole discretion and without obligation of any kind whatsoever, may elect to make a Junior Advance notwithstanding that any one or more of the foregoing conditions is not satisfied, and by doing so Junior Lender shall not be deemed to have waived his right to require the satisfaction of any such conditions with respect to any other Junior Advance.

2.      Legal Expenses.  The Borrower agrees to promptly reimburse Junior Lender's legal fees and costs incurred in the drafting of this Agreement.  Should Borrower be unable to fund this payment, these fees and costs shall be added to the principal amount of the Junior Secured Line of Credit Loan.

3.      Representations and Warranties.  When Borrower signs this Agreement, and until Junior Lender is repaid in full, the Borrower makes the following representations and warranties to the Junior Lender.

3.1     Recitals.        The above Recitals serve as the basis for this Agreement and are a substantive, contractual part hereof. The Parties each acknowledge and agree that the descriptions, information and factual statements contained in the Recitals are true and correct as of the date hereof and are incorporated within this Agreement and made a part hereof for all purposes as if fully rewritten herein.

3.2     Existence.       The Borrower is a limited liability company formed, in good standing and existing under the laws of the State of Washington.

4

3.3     Authorization. This Agreement, the Junior Secured Loan Documents and any other instruments, agreements, financing statements or other documents which may be required hereunder are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

3.4     Enforceable Agreement.  Each Loan Document is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower and the WA Collateral  in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable.

3.5     Good Standing.  In each jurisdiction in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

3.6     No Conflicts.  No Loan Document conflicts with any law, agreement, or obligation by which the Borrower is bound, with the exception of certain provisions of the Senior Lender Loan Documents, which U.S. Bank has waived in writing.

3.7     No Event of Default.  There is no event which is, or with notice or lapse of time or both would be, an Event of Default under this Agreement.

3.8     Location of Borrower.  The chief executive office of the Borrower is located at the address stated in Recital A above.

4.     Covenants.   Except as otherwise agreed to in writing by Junior Lender and Senior Lender, the Borrower agrees, so long as any amount is owed by Borrower to Senior or Junior Lender under this Agreement, to perform each of the following covenants:

4.1     Use of Proceeds.  To use the proceeds of the Junior Secured Line of Credit Loan only in accordance with the provisions of this Agreement and the Budget.

4.2     Other Liens.  Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except the following (collectively, the "Permitted Liens"):

(a)     liens and security interests in favor of the Junior Lender or Senior Lender;

(b)     liens for taxes not yet due;

(c)     liens outstanding on the date of this Agreement;

(d)     purchase money security interests in assets acquired after the Effective Date of this Agreement in the ordinary course of business or in favor of such other lenders as Junior Lender may consent to for which adequate consideration is received and which do not, in Junior Lender's reasonable discretion, impair or threaten to impair Junior Lender's rights and remedies hereunder or under the Loan Documents; and

(e)     statutory liens of carriers, warehousemen, mechanics, materialmen, bankers and other liens imposed by law and created in the ordinary course of business that are not overdue

5

by more than 60 days or that are being contested in good faith and as to which adequate reserves have been established in accordance with generally accepted accounting principles.

4.3 Maintenance of Business and Assets

(a) not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so;

(b) not to transfer any of the WA Collateral to a trust;

(c) not to enter into any sale and leaseback agreement covering any of the WA Collateral;

(d) to maintain and preserve all rights, privileges, and franchises the Borrower now has or hereafter acquires;

(e) not to declare or pay any distribution either in cash, equity or any other property on Borrower's membership interests now or hereafter outstanding, nor redeem, retire, repurchase or otherwise acquire any interest of any class of Borrower's membership interests now or hereafter outstanding;

(f) not to pay any compensation, bonus or other financial remuneration to any officer, director, employee or other person other than in the ordinary course of business and as set forth in the approved Budget;

(g) not to merge into or consolidate with any other entity; and

(h) not to (i) sell (other than ordinary course sales to customers), assign or otherwise transfer or encumber any intellectual property, (ii) assign or otherwise transfer or encumber this Agreement, or (iii) create an obligation whereby the Borrower is required to pay all or a portion of its earnings to any party in priority to the Junior Lender, without first obtaining the prior written consent of Junior Lender to such sale, assignment, transfer or encumbrance.

4.4 Loans. Not to make or receive any loans, advances or other extensions of credit, other than the Junior Secured Line of Credit Loan and the Senior Secured Line of Credit Loan, without first obtaining the prior written consent of Junior Lender.

4.5 Notices to Lender. To promptly notify the Junior Lender in writing of:

(a) any lawsuit filed or threatened to be filed against the Borrower;

(b) any material dispute between any governmental authority and the Borrower;

(c) any Event of Default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an Event of Default;

(d) any material adverse change in the Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the Junior Secured Line of Credit Loan, based on circumstances not described in the foregoing Recitals;

#5216966 v1 / 32789.001

(e)     any change in the Borrower's name, legal structure, states of registration, places of business, or chief executive office, other than those contemplated in the foregoing Recitals; and

(f)     any actual contingent liabilities of the Borrower, and any such contingent liabilities which are reasonably foreseeable.

4.6     <u>Compliance with Laws</u>.  To comply with all applicable laws, regulations, and orders of any governmental authority.

4.7     <u>Books and Records</u>.  To maintain adequate books and records in accordance with generally accepted accounting principles consistently applied, and permit any representative of Junior Lender, at any reasonable time, to inspect, audit and examine such books and records, to make copies of the same, and to inspect the properties of Borrower.

4.8     <u>Perfection of Liens</u>.  To help the Junior Lender perfect and protect his security interests and liens, and reimburse him for related costs he incurs to protect his security interests and liens.

4.9     <u>Cooperation</u>.  To take any action reasonably requested by the Junior Lender to carry out the intent of this Agreement.

4.10     <u>Performance</u>.  To punctually pay all principal, interest or other liabilities due under any of the Junior Secured Loan Documents at the times and place and in the manner specified therein.  To maintain and keep in force, for each business in which the Borrower is engaged, insurance of the types and in amounts customarily carried in similar lines of business.  To pay and discharge when due any and all indebtedness, obligations, assessments and taxes.  To promptly give notice to Junior Lender of any Event of Default with reasonable detail.

5.     <u>Default and Remedies</u>.  If any of the following events of default occurs (each an "<u>Event of Default</u>"), and if capable of cure is not cured within thirty (30) days, Junior Lender may, subject to applicable law, declare the Borrower in default and declare all amounts owing by the Borrower under this Agreement to be due and payable in full, at which time all such amounts will become due and payable without presentment, demand, protest, notice of acceleration, intention  to acceleration or any notice of any kind, all of which are waived by the Borrower.  If any Event of Default occurs, Junior Lender will have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity.  If an Event of Default occurs under the paragraph entitled "Solvency," below, with respect to the Borrower, then, to the extent permitted under applicable law, the entire debt outstanding under this Agreement will automatically be due immediately.

5.1     <u>Failure to Pay</u>.  The Borrower fails to pay in full when due any amounts owing to Junior Lender under the Junior Secured Loan Documents or the Indemnity Agreement, including without limitation payment in full of the Junior Secured Line of Credit Loan on demand by Junior Lender.

#5216966 v1 / 32789.001

5.2     Other Nonpayment Defaults.  Any default by Borrower not involving failure to pay occurs under this Agreement, any other Junior Secured Loan Documents or the Indemnity Agreement.

5.3     False Information.  Borrower has given Junior Lender false or misleading information or representations.

5.4     Solvency.  (a) Borrower files a bankruptcy petition, a bankruptcy petition is filed against Borrower, or Borrower makes a general assignment for the benefit of creditors.  The default will be deemed cured if any bankruptcy petition is dismissed with a period of 45 days after the filing; provided, however, that such cure opportunity will be terminated upon the entry of an order for relief in any bankruptcy case arising from such a petition; or (b) a receiver or similar official is appointed for a substantial portion of Borrower's business, or such business is terminated, or, if the Borrower is otherwise liquidated or dissolved.

5.5     Lien Priority.  The Junior Lender fails to have an enforceable lien against the WA Collateral senior in priority to all other liens, security interests, or encumbrances, other than Permitted Liens.

5.6     Lawsuits.  Except for the Pending Litigation, any other lawsuit or lawsuits are filed against Borrower seeking in an aggregate amount of One Hundred Thousand Dollars ($100,000.00) or more in excess of any insurance coverage, and/or which interferes with or threatens to interfere with Borrower's material obligations hereunder.

5.7     Judgments.  Any final judgments or arbitration awards are entered against Borrower, or Borrower enters into any settlement agreements with respect to any litigation or arbitration, in an aggregate amount of Twenty Five Thousand Dollars ($25,000.00) or more in excess of any insurance coverage.

5.8     Material Adverse Change.  A material adverse change occurs, or is reasonably likely to occur, in Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the credit, other than any of the material adverse changes described in the Recitals.

6.  Conditions Precedent.  This Agreement shall not become effective, binding or enforceable unless each of the following conditions precedent is satisfied on or before September 1, , 2022, unless such deadline is waived or extended by the Parties, it being understood and agreed that *time is of the essence* of this Agreement.

6.1     Execution and Delivery of Agreement.  Each Party shall deliver to each other Party counterparts of this Agreement, duly executed by an authorized representative.

6.2     Execution of Other Loan Documents.  Each party to the Junior Secured Loan Documents shall deliver to each other Party counterparts of the Junior Secured Loan Documents, duly executed by an authorized representative.

6.3     Consent By Senior Lender.  Senior Lender shall have delivered its signed consent to Borrower entering into the Junior Secured Loan Documents, in form reasonably satisfactory to

Junior Lender and including such waivers and other terms as Junior Lender may reasonably require.

      6.4    <u>Proof of Authorization</u>.  Upon request of a Party, any and all Parties who are entities shall provide copies of such fully and properly executed company resolutions, authorizations, minutes, incumbency certificates or other documents as may be reasonably required to confirm the due authorization and capacity of the Party's undersigned representative to execute and deliver this Agreement.

7.    <u>Intentionally Left Blank.</u>

8.    <u>Miscellaneous Provisions</u>.

      8.1  <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of Washington.  To the extent that the Junior Lender has greater rights or remedies under federal law, this paragraph will not be deemed to deprive the Junior Lender of such rights and remedies.  The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Agreement or any other Junior Secured Loan Document.

      8.2    <u>Successors and Assigns; Beneficiaries</u>.   This Agreement is binding on the Borrower's and the Junior Lender's successors and assignees.  The Borrower agrees that it may not assign this Agreement.  This Agreement is made and entered into for the sole protection and benefit of the parties hereto and their respective successors and assigns, and no other person or entity shall be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any other Loan Document to which it is not a party.

      8.3    <u>Severability; Waivers</u>.  If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced.  The Junior Lender retains all rights, even if he makes a loan after the occurrence of an Event of Default.  If Junior Lender waives an Event of Default, he may enforce a later Event of Default.  Any consent or waiver under this Agreement must be in writing.

      8.4    <u>Attorneys' Fees</u>.  The Borrower shall pay to the Junior Lender on demand any and all expenses, including reasonable attorneys' fees and costs, incurred or paid by the Junior Lender in protecting, preserving or enforcing the Junior Lender's rights and remedies under this Agreement or any other Loan Document.

      8.5    <u>Notices</u>.  All notices required under this Agreement will be personally delivered or sent by email, first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or to such other addresses as a party may specify from time to time in writing to the other party.  Notices and other communications will be immediately effective upon personal or email delivery or (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise, when delivered.

#5216966 v1 / 32789.001

8.6     Electronic Signatures; Counterparts.     This Agreement may be executed and delivered (including by facsimile or email transmission) in any number of counterparts all of which, taken together, shall constitute the entire agreement between the Parties, all of which shall constitute one Agreement. The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts.  This Agreement may be executed using electronic signatures (PDF) and will be effective and binding as fully as a manually executed instrument. The Parties agree to deliver all original manually signed pages promptly following execution thereof, but any failure to deliver such pages shall not affect the validity or enforceability of this Agreement.

8.7     U.S. Bank Consent.     By signing in the space provided below, U.S. Bank acknowledges and agrees that it has no objection to the Parties entering into and performing under the Junior Secured Loan Documents.

8.8     Construction.   The Parties each acknowledge and agree that it was represented by counsel in connection with the execution and delivery of this Agreement, that it and its counsel reviewed and participated in the preparation and negotiation of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party  shall not be employed in the interpretation of this Agreement.


**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the Borrower and Junior Lender have executed this Agreement as of the date first above written:

#5216966 v1 / 32789.001

| BORROWER: | JUNIOR LENDER: |
|---|---|
| WIRELESS ADVOCATES, LLC, a Washington limited liability company<br><br>By:_____<br>    Daniel E. Brettler<br>Its:  Chairman and CEO<br>400 Fairview Avenue North<br>Seattle, Washington 98109<br>Email:  dbrettler@cartoys.com | By:_____<br>    Daniel E. Brettler<br>4124 55th Avenue East<br>Seattle, WA 98105<br>Email: dbrettler@cartoys.com |

# BRETTLER JUNIOR SECURED LINE OF CREDIT NOTE

$6,200,000
Seattle, Washington
December 1, 2022

For value received, Wireless Advocates, LLC, a Washington limited liability company with offices at 400 Fairview Avenue North, Seattle, WA 98109 (the "Borrower"), promises to pay to the order of Daniel E. Brettler, 4124 55th Avenue NE, Seattle, WA 98105 (the "Junior Lender") or its assigns the principal amount of six million two hundred thousand dollars ($6,200,000) (a "Junior Advance") advanced as a demand loan under the Brettler Junior Secured Line of Credit Note (the "Note"), together with interest on the outstanding balance and costs as provided by this Note and that certain Junior Secured Loan Agreement, dated as of December 1, 2022, as may be amended and restated, supplemented or otherwise modified from time to time (the "Loan Agreement"). Capitalized terms in this Note not otherwise defined shall have the same meaning as is provided in the Loan Agreement, the Brettler Security Agreement or other related documents (collectively with this Note, the "Junior Secured Loan Documents").

1.      Interest.      The Borrower promises to pay interest on each Advance under this Note, and on all costs due under this Note, from the date of disbursement until paid at the rate of 8.0 percent per annum (the "Contract Rate Interest").  Upon an Event of Default as defined below, additional interest at the rate of 5.0 percent per annum (the "Default Rate Interest") shall also automatically accrue on the principal amounts of all Advances and costs under this Note, including without limitation attorneys' fees.  Interest shall be computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

2.      Demand Note.  The Junior Advance, all accrued interest, and all costs, fees, and other expenses Borrower must pay under this Note (collectively, the "Obligations") shall be paid in full on demand by Junior Lender.

3.      Collateral.      Pursuant to the Brettler Security Agreement, all Obligations under this Note and the Junior Secured Loan Documents are secured by the WA Collateral, consisting of substantially all of the Borrower's assets now owned or acquired in the future.

4.      Compliance With Applicable Law.  All agreements between the Borrower and Junior Lender pertaining to the Obligations under this Note are expressly limited so that in no event whatsoever shall the amount of interest paid or agreed to be paid to Junior Lender exceed the highest rate of interest permissible under applicable law. If, from any circumstances whatsoever, fulfillment of any provision of this Note or any other instrument securing this Note or all or any part of such indebtedness, at the time performance of such provision shall be due, shall involve exceeding the interest limitation validly prescribed by law which a court of competent jurisdiction may deem applicable hereto, then the obligation to be fulfilled shall be reduced to an amount computed at the highest rate of interest permissible under such applicable law, and if, for any reason whatsoever, Junior Lender shall ever receive as interest an amount which would be deemed unlawful under such applicable law, such interest shall be automatically applied to the

payment of the principal amount described herein or otherwise owed by the Borrower to Junior Lender (whether or not then due and payable), and not to the payment of interest.

5.    Events of Default. The following is a statement of the rights of Junior Lender and the conditions to which this Note is subject, and to which the holder hereof (the "Holder"), by the acceptance of this Note, agrees.  The occurrence of any of the following shall constitute an "Event of Default" under this Note:

(a)    Failure to Pay.  The Borrower shall fail to pay to Junior Lender when due any principal, interest or other payment hereunder or under any of the Junior Secured Loan Documents;

(b)    Breach.  (i) Any representation or warranty of the Borrower under the Loan Agreement or any of the other Junior Secured Loan Documents shall be untrue as of the date made, or (ii) the Borrower shall breach any covenant in the Loan Agreement or any other Junior Secured Loan Documents;

(c)    Cross Default.  The Borrower defaults under any other obligations to Junior Lender under the Junior Secured Loan Documents, the Indemnity Agreement or under any obligations to Senior Lender under the Senior Secured Loan Documents not waived by the Senior Lender in writing;

(d)    Voluntary Bankruptcy or Insolvency Proceedings.  The Borrower shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of itself or any of its creditors, (iii) be dissolved or liquidated in full or in part, (iv) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (v) take any action for the purpose of effecting any of the foregoing;

(e)    Involuntary Bankruptcy or Insolvency Proceedings.  The filing of a proceeding for the appointment of a receiver, trustee, liquidator or custodian of the Borrower, or all or a substantial part of the property of the Borrower, or the filing of an involuntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Borrower or the debts thereof, under any bankruptcy, insolvency or other similar law or hereafter in effect, and such proceeding or an order for relief therein shall not be dismissed or discharged within sixty (60) days of the commencement of such proceeding or the entry of such order;

(f)    Cessation of Business.  Unless otherwise waived in writing by the Junior Lender and Senior Lender, there shall occur a cessation of a substantial part of the business of the Borrower; or the Borrower shall suffer the loss or revocation of any material license or permit now held or hereafter acquired which is necessary to the continued or lawful operation of its business; or the Borrower shall be enjoined, restrained or in any other way prevented by a court, governmental or administrative order from conducting all or any material part of its business;

(g)     Loss of Collateral. There shall occur any material loss, theft, revocation, termination, damage, destruction or other material loss of value of any WA Collateral not fully covered (subject to reasonable deductibles) by insurance;

(h)     Material Adverse Effect. Other than a material adverse effect as described in the Junior Secured Loan Documents, the occurrence of any event (financial or otherwise) having a material adverse effect on Borrower's business, as determined by Junior Lender in his reasonable discretion, and such material adverse effect remains un-remedied within a reasonable time following written notice of such event by Junior Lender to the Borrower.

6.     Remedies of Junior Lender Upon Event of Default. Upon the occurrence or existence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Junior Lender may declare all outstanding Obligations payable by the Borrower hereunder to be immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Such acceleration and the accrual of both a Contract Rate and Default Rate of Interest shall be automatic and without any notice of other action by Junior Lender. In addition to the foregoing remedies, following the Maturity Date or the occurrence of an Event of Default not subject to a cure right of Borrower, Junior Lender may exercise any other right, power or remedy granted to it or otherwise permitted to it by law or under any other agreement including, without limitation, this Note, the Loan Agreement or any other Loan Document, either by suit in equity or by action at law or under any other agreement including, without limitation, this Note, the Security Agreement, the Loan Agreement or any other Loan Document, either by suit in equity or by action at law.

7.     Payments and Prepayments. Payments shall be made in lawful tender of the United States. Borrower shall have the right, at any time, to prepay this Note in whole or any part hereof, but any such prepayments shall be credited first to fees and costs, then accrued interest and then principal.

8.     Successors and Assigns. The rights and obligations of the Borrower and the holder of this Note shall be binding upon and shall benefit the successors, assigns, heirs, administrators and transferees of the parties. The Borrower acknowledges that Junior Lender may, upon notice to the Borrower, assign its rights and obligations under this Note and any related documents and agreements, including the right to receive payment hereunder. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Borrower without the prior written consent of the Junior Lender.

9.     Waiver and Amendment. Any provision of this Note may be amended, waived or modified upon the written consent of the Borrower and Junior Lender.

10.     Notices. All notices and other communications required or permitted hereunder shall be in writing and shall be hand delivered or sent via facsimile, overnight courier service, electronic email, or mailed by certified or registered mail, postage prepaid, return receipt requested, addressed or sent (i) if to the Junior Lender, at the address first shown above, or at such other address as the Junior Lender shall have furnished to the Borrower in writing, or (ii) if to the Borrower, at the address first shown above, or at such other address as the Borrower shall have

furnished to the Junior Lender in writing. Notices and other communications will be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise, when delivered.

11. <u>Expenses; Waivers</u>. If action is instituted to collect this Note, the Borrower shall pay all of Junior Lender's costs and expenses, including, without limitation, reasonable and documented attorneys' fees and costs, incurred in connection with such action. To the maximum extent permitted by applicable law, the Borrower hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this Note, except such notices as are required from Junior Lender to trigger any applicable cure period.

12. <u>Governing Law</u>. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Washington, without regard to the conflicts of law provisions of the State of Washington or of any other state. The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Note, the Loan Agreement, the Security Agreement or any other Loan Documents.

13. **JURY TRIAL WAIVER. JUNIOR LENDER, BY ITS ACCEPTANCE HEREOF, AND THE BORROWER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT ONE THAT MAY BE WAIVED. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, JUNIOR LENDER AND THE BORROWER WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE JUNIOR SECURED LOAN DOCUMENTS.**

14. **<u>No Oral Agreements</u>. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the undersigned has executed this Brettler Junior Secured Line of Credit Note as of the date first written above.

**WIRELESS ADVOCATES, LLC**
a Washington limited liability Company

By:_____
        Daniel E. Brettler
Its Chairman and CEO

# BRETTLER SECURITY AGREEMENT

This Brettler Security Agreement (the "<u>Agreement</u>") dated as of December 1, 2022 is given by Wireless Advocates, LLC, a Washington limited liability company ("<u>WA</u>" or "<u>Borrower</u>") in favor of Daniel E. Brettler ("<u>Brettler</u>" or "<u>Junior Lender</u>").  Capitalized Terms not otherwise defined herein shall have the same meaning as is provided in that certain Brettler Junior Secured Loan Agreement (the "<u>Junior Secured Loan Agreement</u>") of even date by and between Borrower and Junior Lender  or by the UCC (as defined below), as the case may be (such meanings to be equally applicable to both the singular and plural forms of the terms defined).  Borrower and Junior Lender are "<u>Parties</u>" and each a "<u>Party</u>" to this Agreement, the Junior Secured Loan Agreement, the Brettler Security Agreement and various other loan documents (collectively, the "<u>Junior Secured Loan Documents</u>").

## I.     <u>Recitals.</u>

A.     WA is a limited liability company organized under the laws of the state of Washington, with its principal place of business at 400 Fairview Avenue North, Seattle, Washington 98109.

B.     Brettler resides at 4124 55th Avenue East, Seattle, WA 98105 and is the majority shareholder of Car Toys, Inc., a Washington corporation ("CT"), which is in turn the majority member of WA.

C.     U.S. Bank, N.A. (the "<u>Senior Lender</u>") is the senior secured lender to Borrower under that certain line of credit loan, dated as of May 1, 2019 (the "<u>U.S. Bank Senior Secured Line of Credit</u>") and the holder of a valid and perfected first priority security interest (the "<u>Senior Lien</u>") against the "Collateral," as defined below.  The Senior Lien is governed by the various promissory notes, loan agreements, security agreements and other documents, all as amended from time to time, including without limitation, that certain Unlimited Guaranty  of Brettler in favor of Senior Lender (collectively, the "<u>Senior Secured Loan Documents</u>").

D.     WA is the owner and operator of a wireless cell phone business conducted at various stores owned and operated by Costco Wholesale Corporation ("<u>Costco</u>") or by the U.S. military at various military installations (the "<u>Military</u>").  WA's wireless cell phone business has been hampered by the COVID-19 pandemic, supply chain issues, the global scarcity of micro-chips, a series of unsuccessful or deferred new wireless cell phone product launches, shrinking gross sales margins on wireless phones and carrier network contracts, and various other market factors resulting in its inability to conduct profitable operations and distribute dividends to its members.

E.     Costco has indicated intends to terminate its agreement with WA under its agreement relating to WA's wireless telephone sales and services at Costco stores.  Costco and WA have been attempting, without success to negotiate an amendment to their agreement to provide for the orderly wind down of their relationship as provided for in their agreement.

1

G.      WA intends to pay off the Senior Lender under the U.S. Bank Line of Credit (the "Senior Secured U.S. Bank Debt") and terminate the Senior Secured U.S. Bank Debt at or about the time of of entering into this Agreement.  This Agreement is intended to permit WA to fund employee payroll obligations, including without limitation, wages, salaries, benefits and payroll taxes, and to fund other expenses necessary to curtail its operations.

H.      Junior Lender, Borrower, and certain officers of Borrower (the "Individual Indemnitees") have entered into that certain Indemnity Agreement, dated as of August 19, 2022 (the "Indemnity Agreement").

I.      Subject to the terms and conditions of this Agreement, Junior Lender may advance the funds (the "Junior Advances as may be necessary to fund payment of WA's wireless phone operations, during their curtailment and pending their complete termination and the orderly liquidation of its assets.

## II.      Agreement.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      Definitions.  The following words will have the following meanings when used in this Agreement.  Capitalized terms not defined shall have the meanings provided to them in the Uniform Commercial Code, RCW 62A.9A-102 or in the Junior Secured Loan Agreement.  All references to dollar amounts will mean amounts in lawful money of the United States of America.

1.1      "Collateral" means:

All the following described property of the Borrower, whether now owned or hereafter acquired, whether now existing or hereafter arising, wherever located and any accessions thereto or proceeds therefrom:

(a)  All General Intangibles, Payment Intangibles, Inventory, Equipment, Chattel Paper (whether tangible or electronic), Commercial Tort Claims, Deposit Accounts, documents, goods, Instruments, Investment Property, Letter-of-credit Rights, letters of credit and money;

(b)  All Fixtures, Records and Goods of every kind and nature including without limitation Inventory and Equipment);

(c)  All Accounts (including all Receivables), contract rights or rights to the payment of money and insurance claims and proceeds;

(d)  All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, including without limitation Commercial Tort Claims;

2

(e)  All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records"); and

(f)  All Intellectual Property Collateral, as defined herein.

1.2  "Copyrights" means, collectively, with respect to Borrower, all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all tangible embodiments of the foregoing and all copyright registrations and applications made by Borrower, in each case, whether now owned or hereafter created or acquired by or assigned to Borrower, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

1.3  "Deposit Account Control Agreement" means an agreement providing Junior Lender control over any Deposit Account of Borrower and in form reasonably satisfactory to Junior Lender and sufficient under the UCC to perfect Junior Lender's security interest in all such Deposit Accounts of Borrower.

1.4  "Event of Default" means Borrower's failure to pay or perform any of the Obligations as and when due to be paid or performed under this Agreement or under any of the Junior Secured Loan Documents.  .

1.5  "Intellectual Property Collateral" means, collectively, the Patents, Trademarks (excluding only United States intent-to-use Trademark applications to the extent that and solely during the period in which the grant of a security interest therein would impair, under applicable federal law, the registrability of such applications or the validity or enforceability of registrations issuing from such applications), Copyrights, Software, Trade Secrets, Intellectual Property Licenses and all other industrial, intangible and intellectual property of any type, including mask works and industrial designs.

1.6  "Intellectual Property Licenses"  means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property Collateral owned by WA.

1.7  "Obligations" means any and all debts, liabilities, and obligations of the Borrower to the Junior Lender, now or hereafter existing and however, whether voluntary or involuntary, direct or indirect or acquired by Junior Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by the Junior Lender for its own account or as agent for another

3

or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable.  The "Obligations" include, without limitation, any and all existing and future Obligations under the Junior Secured Loan Documents and the Indemnity Agreement as well as any and all other existing or future obligations of the Borrower to the Junior Lender for reasonable attorneys' fees and all other costs and expenses incurred by Junior Lender however arising, including those relating to the creation, collection or enforcement of any debts, liabilities, or obligations of the Borrower to the Junior Lender, U.S. Bank and any other parties.

      1.9    "Patents" means, collectively, with respect to Borrower, all patents issued or assigned to, and all patent applications and registrations made by Borrower, whether issued, established or registered or recorded in the United States or any other country or any political subdivision thereof and all tangible embodiments of the foregoing, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

      1.10    "Receivables" means all (i) Accounts, (ii) Chattel Paper, (iii) Payment Intangibles, (iv) Instruments, and (v) to the extent not otherwise covered above, all other rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the UCC together with all of Borrower's rights, if any, in any goods or other property giving rise to such right to payment and all collateral or other supporting obligations related thereto and all Records relating thereto.

      1.11    "Trade Secrets" means, collectively, with respect to Borrower, all know-how, business secrets, manufacturing and production processes and techniques, inventions, research and development information, technical, marketing, financial and business data and databases, pricing and cost information, business and marketing plans, customer and supplier lists and information, all other confidential and proprietary information and all tangible embodiments of the foregoing, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to such trade secrets, (ii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto including damages and payments for past, present or future misappropriations thereof, (iii) rights corresponding thereto throughout the world and (iv) rights to sue for past, present or future misappropriations thereof.

      1.12    "Trademarks" means, collectively, with respect to Borrower, all trademarks (including service marks), slogans, logos, symbols, certification marks, collective marks, trade dress, uniform resource locators (URL's), domain names, corporate names and trade names,

whether statutory or common law, whether registered or unregistered and whether established or registered in the United States or any other country or any political subdivision thereof, including those listed in the schedule attached to that certain Trademark Security Agreement, dated as of June 14, 2018, that are owned by or assigned to Borrower, all registrations and applications for the foregoing and all tangible embodiments of the foregoing, together with, in each case, the goodwill symbolized thereby and any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

1.13 "Security Agreement" means this Agreement, as amended, restated and supplemented by this Agreement, and as may be further amended or modified from time to time, together with all exhibits and schedules attached to this Security Agreement from time to time.

1.14 "Source Code Escrow Agreement" means an agreement for placing and maintaining software source code, documentation, and related materials in escrow with a third-party escrow agent under the terms of a software license agreement, with instructions on how to adapt the agreement for use under a software as a service (SaaS) agreement.

1.15 "Uniform Commercial Code" or "UCC" shall mean the Washington Uniform Commercial Code, Title 62A RCW, Chapter 9A, as amended from time to time, or any successor provisions of law.

2. Grant of Security Interest.

For valuable consideration, the Borrower (1) grants to the Junior Lender a security interest in the Collateral to secure the Obligations, (2) agrees that the Junior Lender will have the rights stated in this Security Agreement with respect to the Collateral, in addition to all other rights which the Junior Lender may have under any existing documents or by applicable law, and (3) agrees to be bound by the provisions of this Agreement. Except for the Permitted Liens, including the security interests held by Senior Lender against the Collateral, the security interests granted herein shall be senior in priority to any and all other security interests in the Collateral and any of Borrower's existing or future assets. This Agreement is subject to the terms of the Junior Secured Loan Agreement between Borrower and Lender of even date herewith, as it may be amended from time to time.

3. Representations, Warranties and Covenants of Borrower.

3.1 Recitals. The above Recitals serve as the basis for this Agreement and are a substantive, contractual part hereof. The Parties each acknowledge and agree that the descriptions, information and factual statements contained in the Recitals are true and correct as of the date hereof and are incorporated within this Agreement and made a part hereof for all purposes as if fully rewritten herein.

3.2    Organization.  The Borrower is a limited liability company organized, validly existing and in good standing under the laws of the State of Washington, and has its principal office at 400 Fairview Avenue North, Seattle, WA 98109.

3.3    Authorization.  The execution, delivery, and performance of this Agreement by the Borrower has been duly authorized by all necessary action by the Borrower and does not conflict with, result in a violation of, or constitute a default under (a) any provision of its certificate of formation, operation agreement, or any agreement or other instrument governing or binding upon the Borrower or (b) any law, government regulation, court decree, or order applicable to Borrower.

3.4    Perfection of Security Interests.  Borrower consents to Junior Lender filing financing statements and otherwise agrees to take whatever other actions are requested by the Junior Lender to perfect and continue the Junior Lender's senior priority security interests in the Collateral.  Upon request of the Junior Lender, and to the extent necessary to perfect Junior Lender's interests therein, the Borrower shall deliver to the Junior Lender any and all of the documents evidencing or constituting the Collateral or such other documents or information as Junior Lender may reasonably require for this purpose.  The Borrower hereby appoints the Junior Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement.  The Borrower will immediately notify the Junior Lender of any change in the Borrower's name, including any change to the assumed business names of the Borrower or any change in its state of organization.  The Borrower will also immediately notify the Junior Lender of any change in the location of the Borrower or the Collateral.  This Agreement is a continuing security agreement and will continue in effect even though all or any part of the Obligations are paid in full.

3.5    Transactions Involving Collateral.  Without Junior Lender's prior written consent, Borrower will not sell or otherwise transfer or dispose of the Collateral, except that the Borrower may sell inventory, machinery and equipment in the ordinary course of business.  The Borrower will not pledge, mortgage, lease, assign, license, rent, subordinate, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of the Junior Lender.  This prohibition includes security interests even if junior in right to the security interests granted under this Agreement.

3.6    Collateral Schedules and Locations.  The Borrower will deliver to the Junior Lender, as often as the Junior Lender will reasonably require, such schedules, lists, descriptions, and designations of such Collateral as the Junior Lender may require to identify the location, nature and extent of such Collateral.

3.7    Status of Collateral.  The Collateral may not be utilized in any way by anyone, except the Borrower, without the Junior Lender's prior written consent.  The Borrower will immediately notify the Junior Lender of all cases involving the return, rejection, repossession, loss or damage of or to any Collateral of any request for credit or adjustment or of any other dispute rising with respect to the Collateral; and generally of all happenings and events affecting the

6

Collateral or the value or the amount of the Collateral. The Borrower will not seek the reissuance of any certificate or other evidence of the Collateral from any governmental entity without the Junior Lender's written consent. The Borrower will not enter into any Intellectual Property Licenses or sale agreement outside the ordinary course of business relating to the Collateral without Junior Lender's written consent.

Borrower agrees that the Junior Lender may at its option at any time, whether or not the Borrower is in default:

(a) Require the Borrower to deliver to the Junior Lender (i) copies of or extracts from the Borrower's books and records, and (ii) information on any contracts, applications or other matters affecting the Collateral;

(b) Examine the Collateral, including the books and records, and make copies of or extracts from the books and records, and for such purposes enter at any reasonable time upon the property where any Collateral or any books and records are located;

(c) Require the Borrower to deliver to the Junior Lender any Instruments, Chattel Paper or Letters of Credit which are part of the Collateral, and to assign to the Junior Lender the proceeds of any such Letters of Credit (provided that so long as there is not an Event of Default, the foregoing obligations shall only be to the extent necessary to perfect Junior Lender's obligation in such Collateral); and/or

(d) Notify any account Borrowers, any buyers, assignees or licensees of the Collateral, or any other persons of the Junior Lender's interest in the Collateral.

3.8     <u>Maintenance of Collateral</u>. Borrower shall maintain and preserve the Collateral and shall pay when due all taxes or other fees and costs required to be paid to a governmental entity to preserve the validity and enforceability of the Borrower's Intellectual Property Collateral and prevent the attachment of any liens or encumbrances against the Collateral, including without limitation the Intellectual Property Collateral.

3.9     <u>Authorization to File Financing Statements and Other Notice Filings</u>. The Borrower hereby irrevocably authorizes the Junior Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of Washington, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of Washington, or such other jurisdiction, for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Borrower is an organization, the type of organization and any organizational identification number issued to the Borrower. The Borrower agrees to furnish any such information to the Junior Lender promptly upon the Junior Lender's request. Borrower

3.11     <u>Taxes, Assessments and Liens</u>. All taxes, assessments and liens upon the Collateral, its use or operation will be paid in accordance with law. Borrower may withhold any

7

such payment or may elect to contest any lien if the Borrower is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as the Junior Lender's interest in the Collateral is not jeopardized, in Junior Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within 30 days, the Borrower will deposit with the Junior Lender cash (other than cash which is itself Collateral of Junior Lender or the proceeds of an advance under the Junior Secured Line of Credit Loan), a sufficient corporate surety bond or other additional security satisfactory to the Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest, Borrower will defend itself and the Junior Lender and will satisfy any final adverse judgement before enforcement against the Collateral. The Borrower will name the Junior Lender as an additional obligee under any surety bond furnished.

        3.12    <u>Compliance with Governmental Requirements</u>. Borrower will comply promptly with all laws, ordinances and regulations of all governmental authorities applicable to the production, disposition, or use of the Collateral. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as the Junior Lender's interest in the Collateral, in Junior Lender's opinion, is not jeopardized.

        3.13    <u>Other Actions</u>. To further the attachment, perfection and first priority of, and the ability of the Junior Lender to enforce, the Junior Lender's security interest in the Collateral, and without limitation on the Borrower's other obligations in this Agreement, and except to the extent prohibited by a term or provision of the Senior Secured Loan Documents not waived in writing by the Senior Lender, the Borrower agrees, in each case at the Borrower's expense, to take the following actions with respect to the following Collateral:

        a.    <u>Promissory Notes and Tangible Chattel Paper</u>. If the Borrower shall at any time hold or acquire any promissory notes or tangible chattel paper, the Borrower shall forthwith endorse, assign and deliver the same to the Junior Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Junior Lender may from time to time specify.

        b.    <u>Deposit Accounts</u>. For each deposit account that the Borrower at any time opens or maintains, the Borrower shall, at the Junior Lender's request and option, pursuant to a Deposit Account Control Agreement in form and substance satisfactory to the Junior Lender, either (a) cause the depositary bank to comply at any time with instructions from the Junior Lender to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of the Borrower, or (b) arrange for the Junior Lender to become the customer of the depositary bank with respect to the deposit account, with the Borrower being permitted, only with the consent of the Junior Lender, to exercise rights to withdraw funds from such deposit account. The Junior Lender agrees with the Borrower that the Junior Lender shall not give any such instructions or withhold any withdrawal rights from the Borrower, unless an Event of Default has occurred and is continuing, or would occur, if effect were given to any withdrawal not otherwise permitted by the Junior Secured Loan Documents. The provisions of this paragraph shall not apply to (i) any deposit account for which the Borrower, the depositary bank

8

and the Junior Lender have entered into a cash collateral agreement specially negotiated among the Borrower, the depositary bank and the Junior Lender for the specific purpose set forth therein, and (ii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Borrower's salaried employees.

c. <u>Investment Property</u>.  If the Borrower shall at any time hold or acquire any certificated securities, the Borrower shall forthwith endorse, assign and deliver the same to the Junior Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Junior Lender may from time to time specify.  If any securities now or hereafter acquired by the Borrower are uncertificated and are issued to the Borrower or its nominee directly by the issuer thereof, the Borrower shall immediately notify the Junior Lender thereof and, at the Junior Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Junior Lender, either (a) cause the issuer to agree to comply with instructions from the Junior Lender as to such securities, without further consent of the Borrower or such nominee, or (b) arrange for the Junior Lender to become the registered owner of the securities.  If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by the Borrower are held by the Borrower or its nominee through a securities intermediary or commodity intermediary, the Borrower shall immediately notify the Junior Lender thereof and, at the Junior Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Junior Lender, either (i) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply with entitlement orders or other instructions from the Junior Lender to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by the Junior Lender to such commodity intermediary, in each case without further consent of the Borrower or such nominee, or (ii) in the case of financial assets or other investment property held through a securities intermediary, arrange for the Junior Lender to become the entitlement holder with respect to such investment property, with the Borrower being permitted, only with the consent of the Junior Lender, to exercise rights to withdraw or otherwise deal with such investment property.  The Junior Lender agrees with the Borrower that the Junior Lender shall not give any such entitlement orders or instructions or directions to any such issuer, securities intermediary or commodity intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by the Borrower, unless an Event of Default has occurred and is continuing, or, after giving effect to any such investment and withdrawal rights not otherwise permitted by the Loan Documents, would occur.

d. <u>Collateral in the Possession of a Bailee</u>.  If any Collateral is at any time in the possession of a bailee, the Borrower shall promptly notify the Junior Lender thereof and, at the Junior Lender's request and option, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to the Junior Lender, that the bailee holds such Collateral for the benefit of the Junior Lender, and that such bailee agrees to comply, without further consent of the Borrower, with instructions from the Junior Lender as to such Collateral.  The Junior Lender agrees with the Borrower that the Junior Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Borrower with respect to the bailee.

9

e.  <u>Commercial Tort Claims</u>.  If the Borrower shall at any time hold or acquire a Commercial Tort Claim, the Borrower shall immediately notify the Junior Lender in a writing signed by the Borrower of the particulars thereof and grant to the Junior Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Junior Lender.  Borrower shall also immediately execute or otherwise authenticate a supplement to this Agreement, and otherwise take all necessary actions to subject such Commercial Tort Claim to the first priority security interest created under this Agreement.

f.  <u>Insurance</u>.  The Borrower will maintain with financially sound and reputable insurers liability insurance with respect to its managers and officers, and casualty insurance as to the Collateral, its properties and business, in such amounts and subject to such terms as are consistent with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts that the Borrower will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Junior Lender.  In addition, all such insurance shall be payable to the Junior Lender as loss payee under a standard loss payee clause.  Without limiting the foregoing, the Borrower will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverages and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property, (ii) maintain all such workers' compensation or similar insurance as may be required by law, and (iii) maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring, on, in or about the properties of the Borrower; business interruption insurance; and product liability insurance.

i.  <u>Insurance Proceeds</u>.  The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, (i) so long as no Event of Default has occurred and is continuing and to the extent that the amount of such proceeds is less than $50,000, be disbursed to the Borrower for direct application by the Borrower solely to the repair or replacement of the Collateral so damaged or destroyed, and (ii) in all other circumstances, at Junior Lender's election be held by Junior Lender as cash collateral for the Obligations.  The Junior Lender may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Junior Lender may reasonably prescribe, for direct application by the Borrower solely to the repair or replacement of the Borrower's property so damaged or destroyed, or the Junior Lender may apply all or any part of such proceeds to the Obligations.

#5155383 v1 / 74115-001

j.    <u>Continuation of Insurance</u>.  All policies of insurance shall provide for at least 30 days prior written cancellation notice to the Junior Lender.  In the event of failure by the Borrower to provide and maintain insurance as herein provided, the Junior Lender may, at its option, provide such insurance and charge the amount thereof to the Borrower.  The Borrower shall furnish the Junior Lender with certificates of insurance and policies evidencing compliance with its foregoing insurance obligations.

4.    <u>Expenditures by Lender</u>.  If not discharged or paid when due, the Junior Lender may (but will not be obligated to) discharge or pay any amounts required to be discharged or paid by the Borrower under this Agreement, including without limitation all taxes, liens, security interests, encumbrances, and other claims, at any time levied or placed on the Collateral.  Junior Lender also may (but will not be obligated to) pay all costs for maintaining and preserving the Collateral.  All such expenditures incurred or paid by the Junior Lender for such purposes will then bear interest at the rate of 8% per annum from the date incurred or paid by the Junior Lender to the date of repayment by the Borrower.  All such expenses will be payable upon demand by the Borrower or, at Junior Lender's election, may be advanced by him.  This Agreement also will secure Borrower's payment of these amounts.  Such right will be in addition to all other rights and remedies to which the Junior Lender may be entitled upon the occurrence of an Event of Default.

5.    <u>Rights and Remedies on Event of Default</u>.  If an Event of Default occurs under any of the Junior Secured Loan Documents, and subject to any and all countervailing requirements of the Senior Secured Loan Documents, the Lender: (a) will have all of the rights of a secured lender under the UCC; and (b) in addition and without limitation to the foregoing, may exercise any one or more of the following rights and remedies, in addition to any granted in any other Junior Secured Loan Documents:

5.1    <u>Assemble Collateral</u>.  The Junior Lender may require the Borrower to deliver to the Junior Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral.  The Junior Lender may require the Borrower to assemble the Collateral and make it available to the Junior Lender at a place to be designated by the Junior Lender.

5.2    <u>Preservation of Collateral</u>.  The Junior Lender may enter upon the property where any Collateral, including any books and records, are located and take possession of such Collateral and such books and records, and use such property (including any buildings and facilities) and any of the Borrower's equipment, if the Junior Lender reasonably deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and use or transfer any of the Borrower's rights and interests in any intellectual property now owned or hereafter acquired by Borrower, if the Junior Lender reasonably deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.  The Borrower agrees that any such use or transfer shall be without any additional consideration to Borrower.

#5155383 v1 / 74115-001

5.3 <u>Sell the Collateral</u>. The Junior Lender will have full power to sell, lease, license, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of the Borrower. The Junior Lender may sell the Collateral at public auction or private sale. The Borrower hereby appoints the Junior Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to sell, lease, transfer or otherwise deal with the Collateral or proceeds thereof. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Junior Lender will give the Borrower reasonable notice of the time after which any private sale or other intended disposition of the Collateral is to be made. The requirements of reasonable notices will be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, will become a part of the Obligations secured by this Agreement and will be payable on demand by the Borrower, with interest at the rate stated in the Junior Secured Loan Agreement from the date of expenditure until repaid.

5.4 <u>Appoint Receiver</u>. In addition to all other remedies herein provided for, Borrower agrees that upon the occurrence of an Event of Default, or any event or circumstance which, with the lapse of time or the giving of notice, or both, would constitute an Event of Default, the Junior Lender as a matter of contract right shall be entitled to the appointment of a general receiver for the Borrower, or an in rem receiver or receivers for all or any part of the Collateral, at Junior Lender's election and in its sole discretion, and whether such receivership be incident to a proposed sale of such property or otherwise, and without regard to the value of the Collateral or the solvency of the Borrower. Borrower consents to the appointment of such receiver or receivers without bond, waives any and all defenses to such appointment and agrees not to oppose any application therefor by the Junior Lender. Borrower acknowledges Junior Lender owes no duty to arbitrate any disputes relating to, or arising under, this Agreement or any of the Junior Secured Loan Documents, including without limitation Junior Lender's right to the appointment of a receiver as provided herein. Nothing in this Agreement shall be construed as depriving the Junior Lender of any of its rights, remedies and privileges it now holds or in the future may hold under applicable law to have a general or in rem receiver appointed pursuant to RCW 7.60.025 as a matter of right; provided, however, that the appointment of such receiver by virtue of any court order, statute or regulation shall not impair or in any manner prejudice the rights of the Junior Lender to receive any and all rents, income or proceeds from the Collateral. Any money advanced by the Junior Lender in connection with any receivership shall be a demand obligation owing by Borrower to the Junior Lender and shall bear interest from the date of such advance until paid at the Default Rate of 13 per cent per annum and shall be a part of the Obligations secured by the Collateral.

5.5 <u>Collect Revenues, Apply Accounts</u>. The Junior Lender, either itself or through a receiver, may collect the payments, rents, income, proceeds, and revenue from the Collateral. The Junior Lender may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as the Junior Lender may determine. For these purposes, the Junior Lender may on behalf of and

in the name of the Borrower, endorse note, checks, drafts, money orders, instruments and items pertaining to payment, shipment, or storage of any Collateral.  To facilitate collection, the Junior Lender may notify Borrower's account Borrowers and obligors on any Collateral to make payments directly to the Junior Lender.

5.6     Other Rights and Remedies.  The Junior Lender will have all the rights and remedies of a secured creditor under the provisions of the UCC.  In addition, the Junior Lender will have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

5.7     Cumulative Remedies.  All of the Junior Lender's rights and remedies, whether evidenced by this Agreement or the Junior Secured Loan Documents or by any other writing or as provided by law, will be cumulative and may be exercised singularly or concurrently.  Election by the Junior Lender to pursue any remedy will not exclude pursuit of any other remedy, and an election to make expenditure or to take action to perform an obligation of the Borrower under this Agreement, after the Borrower's failure to perform, will not affect the Junior Lender's right to declare a default and to exercise its remedies.

5.8     Marshalling.  The Junior Lender shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.  To the extent that it lawfully may, the Borrower hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Junior Lender's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Borrower hereby irrevocably waives the benefits of all such laws.

6.     Miscellaneous Provisions.

6.1     Entire Agreement.  This Agreement contains the complete, full, and exclusive understanding of the Parties as to its subject matter.  Any amendments to this Agreement shall be effective and binding on the Parties only if any such amendments are in writing and signed by the authorized representatives of both Parties.

6.2     Notices.  All notices required to be given under this Agreement will be given in writing and will be effective when actually delivered or when deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address in the Junior Secured Loan Agreement.  Any party may changes its address for notices under this Agreement by giving formal written notice to the other party, specifying that the purpose of the notice is to change the party's address.  For notice purposes, the Borrower agrees to keep the Junior Lender informed at all times of the Borrower's current address.

#5155383 v1 / 74115-001

6.3     Severability.  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding will not render that provision invalid or unenforceable as to any other persons or circumstances.  If feasible, any such offending provision will be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it will be stricken and all other provisions of this Agreement in all other respects will remain valid and enforceable.

6.4     Lender Successor Interests; Nonassignability of Borrower's Interests. Subject to the limitations set forth above on transfer of the Collateral, this Agreement will be binding and inure to the benefit of the Junior Lender, its successors and assigns.   Borrower acknowledges and agrees its rights under this Agreement as well as any other Junior Secured Loan Document may not be assigned in whole or part.

6.5     Waiver.  The Junior Lender and the Borrower will not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by the party against whom enforcement is sought.  No delay or omission on the part of the Junior Lender or the Borrower in exercising any right will operate as a waiver of such right or any other right.  A waiver by the Junior Lender or the Borrower of a provision of this Agreement will not prejudice or constitute a waiver of the Junior Lender's or the Borrower's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by the Junior Lender or the Borrower, nor any course of dealing between the Junior Lender and the Borrower, will constitute a waiver of any of the Junior Lender's or the Borrower's rights or of any of the Junior Lender's or the Borrower's obligations as to any future transactions.  Whenever the consent of the Lender or the Borrower is required under this Agreement, the granting of such consent by the Junior Lender or the Borrower in any instance will not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Junior Lender or the Borrower.

6.6     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Washington.  To the extent that the Junior Lender has greater rights or remedies under the federal law of the United States of America, this paragraph will not be deemed to deprive the Junior Lender of such rights and remedies as may be available under the federal law of the United States of America.

6.7     Attorney's Fees and Costs.    The Borrower shall pay to the Junior Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Junior Lender in protecting, preserving or enforcing the Junior Lender's rights and remedies under or in respect of any of the Obligations or any of the Collateral.

6.8     Electronic Execution; Counterparts.  This Agreement may be executed and delivered (including by facsimile or email transmission) in any number of counterparts all of which, taken together, shall constitute the entire agreement between the Parties, all of which shall constitute one Agreement. The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts.  This Agreement may be executed

using electronic signatures (PDF) and will be effective and binding as fully as a manually executed instrument. The Parties agree to deliver all original manually signed pages promptly following execution thereof, but any failure to deliver such pages shall not affect the validity or enforceability of this Agreement.

6.9     Waiver of Jury Trial.  THE BORROWER WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE JUNIOR SECURED LOAN DOCUMENTS, OR ANY RIGHTS, REMEDIES, OBLIGATIONS, OR DUTIES HEREUNDER OR THEREUNDER, OR THE PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.  Except as prohibited by law, the Borrower waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.  The Borrower (i) certifies that neither the Junior Lender nor any representative, agent or attorney of the Junior Lender has represented, expressly or otherwise, that the Junior Lender would not, in the event of litigation, seek to enforce the foregoing waivers or other waivers contained in this Agreement, and (ii) acknowledges that, in entering into the Junior Secured Loan Agreement and the other Junior Secured Loan Documents to which the Junior Lender is a party, the Junior Lender is relying upon, among other things, the waivers and certifications contained in this section.

6.10     Venue and Consent to Jurisdiction.  The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document.

6.11.     Construction.  In the event of any conflict between the terms of this Agreement and the Junior Secured Loan Agreement, the terms of the Loan Agreement shall control.   The Parties each acknowledge and agree that he and it were represented by independent counsel in connection with the negotiation, execution and delivery of this Agreement, who reviewed and participated in the preparation and negotiation of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

*[Signatures on following page]*

#5155383 v1 / 74115-001

EXECUTED as of the day and year first set forth above.

| BORROWER: | JUNIOR LENDER: |
|---|---|
| Wireless Advocates, LLC, a Washington limited liability company | |
| By: Daniel Brettler,<br>Its: Chairman and Chief Executive Officer | Daniel Brettler |

#5155383 v1 / 74115-001

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Ashley R. Gordon 2062-24-8144

**B. E-MAIL CONTACT AT FILER (optional)**
agordon@karrtuttle.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Karr Tuttle Campbell
701 Fifth Avenue, Suite 3300
Seattle WA USA 98104

Date of Filing : 08/15/2022
Time of Filing : 04:05:00 PM
File Number   : 2022-227-6099-5
Lapse Date    : 08/15/2027

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Wireless Advocates LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 400 Fairview Ave N, Suite 900 | Seattle | WA / 98109 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Brettler | Daniel E. | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 4124 55th Ave N.E. | Seattle | WA / 98105-4946 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

**All assets whether now owned or hereafter acquired.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
32789-1

Exhibit B

**Fill in this information to identify the case:**

Debtor 1 ___Wireless Advocates, LLC_____

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Western District of Washington

Case number ___23-10117-TWD_____

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or **redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Daniel E. Brettler
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ___Dan Brettler___

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Karr Tuttle Campbell
Name

701 Fifth Ave, Suite 3300
Number        Street

Seattle                    WA            98104
City                    State            ZIP Code

Contact phone ___206-223-1313___

Contact email ___bleaverton@karrtuttle.com___

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number        Street

_____
City                    State            ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____
Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**

$ _____5,022,606.64_____. **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Secured Line of Credit

9. **Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: All assets

**Basis for perfection:** UCC-1 Filing Statement

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ 30,000,000.00 Estimated see attached

**Amount of the claim that is secured:** $ 5,022,606.64

**Amount of the claim that is unsecured:** $ 0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ 5,022,606.64

**Annual Interest Rate** (when case was filed) 13.00 %

☑ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☑ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ 15,150.00 |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  05/16/2023
                   MM / DD / YYYY

_Signature_

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Daniel E. Brettler |
| | First name        Middle name        Last name |
| Title | _____ |
| Company | _____ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 4124 55th Ave N.E. |
| | Number        Street |
| | Seattle        WA        98105 |
| | City        State        ZIP Code |
| Contact phone | 206-223-1313        Email bleaverton@karrtuttle.com |

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In re:

WIRELESS ADVOCATES, LLC,

Debtor.

No. 23-20117-TWD

**ADDENDUM TO
DANIEL E.  BRETTLER
PROOF OF CLAIM**

**I.      Amount of Claim**

1.      As of January 23, 2023 (the "Petition Date"), Wireless Advocates, LLC (the "Debtor") was, and still is, indebted to Daniel E. Brettler ("Secured Creditor") in an amount not less than $5,022,606.64 (the "Indebtedness"), comprised of the following:

a.      A Secured Loan (the "Loan") with a balance of not less than $5,007,456.14

b.       as of the Petition Date, plus, without limitation, fees, costs, expenses, and interest, which may continue to accrue through the present date on account of the Loan. A breakdown of the Loan is attached as **Exhibit A.**

c.      Unpaid wages in the amount of $15,150.00.

d.      Contingent and unliquidated claim for indemnification from the Debtor based on an agreement to indemnify certain Wireless Advocates management employees attached as **Exhibit F**.

///

///

ADDENDUM TO DANIEL E. BRETTLER
PROOF OF CLAIM - 1

#5387570 v1 / 32789-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

## II.  Basis of and Security for Claim

2.      The Indebtedness owed under the Loan is evidenced by the Brettler Junior Secured Promissory Line of Credit Note (the "Note"), dated as of  December 1, 2022,  by the Debtor, payable to the order of Secured Creditor in the face amount of $6,200,000.  A true and correct copy of the Note is attached as **Exhibit B**.  A copy of the Loan Agreement is attached as **Exhibit C.** The Debtor's obligations under the Loan and the other documents executed in connection with the Loan, including a Junior Secured Loan Agreement (collectively, the "Loan Documents") are secured by among other things, the Brettler Security Agreement dated as of December 1, 2022, executed by the Debtor, in favor of Secured Creditor **Exhibit D** (the "Security Agreement"). Pursuant to the Security Agreement, the Debtor granted Secured Creditor a security interest in substantially all the Debtor's assets.  The Security Agreement was perfected by a  UCC-1 Financing Statement filed with the Washington  Secretary of State on August  15, 2022 under File Number 2022-227-6099-5 (the "UCC-1"), a true and accurate copy of which is attached hereto as **Exhibit E**.

3.      The Value of the property securing the claim is an estimated value as of the Petition Date

## III.   Supporting Documents

4.       Secured Creditor attaches the documents referenced above and listed on the Index below, to support its claim. Secured Creditor reserves all rights to supplement this Proof of Claim with additional documents.

## IV.   506(b) Rights

5.      This Proof of Claim asserts claims as of the Petition Date. Secured Creditor reserves all of its rights to payment as an oversecured creditor of all amounts to which it is entitled under 11  U.S.C. § 506(b), including but not limited to, post-petition interest at the default rate, attorney fees and fees of other professionals, and other costs and expenses incurred by Secured Creditor during the bankruptcy case.

ADDENDUM TO DANIEL E. BRETTLER
PROOF OF CLAIM - 2

#5387570 v1 / 32789-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

## V.    Reservation of Rights and No Waiver

6.    The execution and filing of this claim is not (i) a waiver by Secured Creditor of the right to assert any and all other claims of whatever kind that it has, or may have, that come to Secured Creditor's attention or arise after the filing of this claim (and the filing of this claim shall not be deemed a waiver of any such rights); (ii) a waiver of Secured Creditor's rights to seek treatment of the claims set forth herein as priority, administrative expense or secured on any other basis, or to exercise any right of setoff and/or recoupment relating thereto; (iii) a consent or submission by Secured Creditor to the jurisdiction of this court with respect to any proceeding commenced in this or any other case against or otherwise involving Secured Creditor; (iv) a waiver of the right to withdrawal of the reference with respect to the subject matter of the claim set forth herein, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Secured Creditor, or to challenge the constitutionality of any part of 28 U.S.C. § 157; (v) an election of remedy that waives or otherwise affects any other remedy; or (vi) a waiver of or limitation on any rights or remedies of Secured Creditor, at law or in equity (including any setoff and/or recoupment rights, lien rights, rights of recoupment or any other rights that Secured Creditor may have against the Debtor or any other entity).

7.    Secured Creditor expressly reserves its rights (i) to respond to any objection to this claim, including by providing additional documentary support for the amounts asserted hereby; (ii) to file any other claims or proofs of claim with respect to the claims set forth herein or otherwise (which claims shall not be deemed to supersede this claim unless otherwise expressly provided), including to seek priority or administrative expense treatment for the claims set forth herein or therein; and (iii) to amend or supplement this claim in any respect, including but not limited to, on account amount owing pursuant to 11 U.S.C. §§ 506(a) and 506(b).

///

///

ADDENDUM TO DANIEL E. BRETTLER
PROOF OF CLAIM - 3

#5387570 v1 / 32789-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

**VI.    Index**

| | |
|---|---|
| **Exhibit A** | Summary of Loan Amounts |
| **Exhibit B** | Note |
| **Exhibit C** | Loan Agreement |
| **Exhibit D** | Security Agreement |
| **Exhibit E** | UCC-1 |
| **Exhibit F** | Indemnity Agreements |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

Exhibit A

## BRETTLER SECURED LOAN COMPUTATION

| DATE | TRANSACTION | AMOUNT | | principle | Interest | | Balance |
|---|---|---|---|---|---|---|---|
| 12/2/2022 | advance | $ 6,172,412.00 | $ | 6,172,412.00 | | $ | 6,172,412.00 |
| 12/6/2022 | payment | $ (1,217,805.00) | $ | 4,954,607.00 | $ 5,486.59 | $ | 4,960,093.59 |
| 1/23/2023 | interest | $ - | $ | 4,954,607.00 | $ 52,849.14 | $ | 5,007,456.14 |

| | | | | |
|---|---|---|---|---|
| Principle | $ 4,954,607.00 | per diem | $ | 1,101.02 |
| Interest | $ 52,849.14 | | | |
| TOTAL | $ 5,007,456.14 | | | |
| Unpaid Wages | $ 15,150.50 | | | |
| | $ 5,022,606.64 | | | |

Exhibit B

# BRETTLER JUNIOR SECURED LINE OF CREDIT NOTE

$6,200,000
Seattle, Washington
December 1, 2022

For value received, Wireless Advocates, LLC, a Washington limited liability company with offices at 400 Fairview Avenue North, Seattle, WA 98109 (the "Borrower"), promises to pay to the order of Daniel E. Brettler, 4124 55th Avenue NE, Seattle, WA 98105 (the "Junior Lender") or its assigns the principal amount of six million two hundred thousand dollars ($6,200,000) (a "Junior Advance") advanced as a demand loan under the Brettler Junior Secured Line of Credit Note (the "Note"), together with interest on the outstanding balance and costs as provided by this Note and that certain Junior Secured Loan Agreement, dated as of December 1, 2022, as may be amended and restated, supplemented or otherwise modified from time to time (the "Loan Agreement"). Capitalized terms in this Note not otherwise defined shall have the same meaning as is provided in the Loan Agreement, the Brettler Security Agreement or other related documents (collectively with this Note, the "Junior Secured Loan Documents").

1.    Interest.    The Borrower promises to pay interest on each Advance under this Note, and on all costs due under this Note, from the date of disbursement until paid at the rate of 8.0 percent per annum (the "Contract Rate Interest"). Upon an Event of Default as defined below, additional interest at the rate of 5.0 percent per annum (the "Default Rate Interest") shall also automatically accrue on the principal amounts of all Advances and costs under this Note, including without limitation attorneys' fees. Interest shall be computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

2.    Demand Note.    The Junior Advance, all accrued interest, and all costs, fees, and other expenses Borrower must pay under this Note (collectively, the "Obligations") shall be paid in full on demand by Junior Lender.

3.    Collateral.    Pursuant to the Brettler Security Agreement, all Obligations under this Note and the Junior Secured Loan Documents are secured by the WA Collateral, consisting of substantially all of the Borrower's assets now owned or acquired in the future.

4.    Compliance With Applicable Law.    All agreements between the Borrower and Junior Lender pertaining to the Obligations under this Note are expressly limited so that in no event whatsoever shall the amount of interest paid or agreed to be paid to Junior Lender exceed the highest rate of interest permissible under applicable law. If, from any circumstances whatsoever, fulfillment of any provision of this Note or any other instrument securing this Note or all or any part of such indebtedness, at the time performance of such provision shall be due, shall involve exceeding the interest limitation validly prescribed by law which a court of competent jurisdiction may deem applicable hereto, then the obligation to be fulfilled shall be reduced to an amount computed at the highest rate of interest permissible under such applicable law, and if, for any reason whatsoever, Junior Lender shall ever receive as interest an amount which would be deemed unlawful under such applicable law, such interest shall be automatically applied to the

payment of the principal amount described herein or otherwise owed by the Borrower to Junior Lender (whether or not then due and payable), and not to the payment of interest.

5. <u>Events of Default</u>. The following is a statement of the rights of Junior Lender and the conditions to which this Note is subject, and to which the holder hereof (the "<u>Holder</u>"), by the acceptance of this Note, agrees.  The occurrence of any of the following shall constitute an "<u>Event of Default</u>" under this Note:

(a) <u>Failure to Pay</u>.  The Borrower shall fail to pay to Junior Lender when due any principal, interest or other payment hereunder or under any of the Junior Secured Loan Documents;

(b) <u>Breach</u>.  (i) Any representation or warranty of the Borrower under the Loan Agreement or any of the other Junior Secured Loan Documents shall be untrue as of the date made, or (ii) the Borrower shall breach any covenant in the Loan Agreement or any other Junior Secured Loan Documents;

(c) <u>Cross Default</u>.  The Borrower defaults under any other obligations to Junior Lender under the Junior Secured Loan Documents, the Indemnity Agreement or under any obligations to Senior Lender under the Senior Secured Loan Documents not waived by the Senior Lender in writing;

(d) <u>Voluntary Bankruptcy or Insolvency Proceedings</u>.  The Borrower shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of itself or any of its creditors, (iii) be dissolved or liquidated in full or in part, (iv) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (v) take any action for the purpose of effecting any of the foregoing;

(e) <u>Involuntary Bankruptcy or Insolvency Proceedings</u>.  The filing of a proceeding for the appointment of a receiver, trustee, liquidator or custodian of the Borrower, or all or a substantial part of the property of the Borrower, or the filing of an involuntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Borrower or the debts thereof, under any bankruptcy, insolvency or other similar law or hereafter in effect, and such proceeding or an order for relief therein shall not be dismissed or discharged within sixty (60) days of the commencement of such proceeding or the entry of such order;

(f) <u>Cessation of Business.</u>  Unless otherwise waived in writing by the Junior Lender and Senior Lender, there shall occur a cessation of a substantial part of the business of the Borrower; or the Borrower shall suffer the loss or revocation of any material license or permit now held or hereafter acquired which is necessary to the continued or lawful operation of its business; or the Borrower shall be enjoined, restrained or in any other way prevented by a court, governmental or administrative order from conducting all or any material part of its business;

(g)     <u>Loss of Collateral</u>. There shall occur any material loss, theft, revocation, termination, damage, destruction or other material loss of value of any WA Collateral not fully covered (subject to reasonable deductibles) by insurance;

(h)     <u>Material Adverse Effect</u>.  Other than a material adverse effect as described in the Junior Secured Loan Documents, the occurrence of any event (financial or otherwise) having a material adverse effect on Borrower's business, as determined by Junior Lender in his reasonable discretion, and such material adverse effect remains un-remedied within a reasonable time following written notice of such event by Junior Lender to the Borrower.

6.     <u>Remedies of Junior Lender Upon Event of Default</u>.  Upon the occurrence or existence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Junior Lender may declare all outstanding Obligations payable by the Borrower hereunder to be immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Such acceleration and the accrual of both a Contract Rate and Default Rate of Interest shall be automatic and without any notice of other action by Junior Lender.  In addition to the foregoing remedies, following the Maturity Date or the occurrence of an Event of Default not subject to a cure right of Borrower, Junior Lender may exercise any other right, power or remedy granted to it or otherwise permitted to it by law or under any other agreement including, without limitation, this Note, the Loan Agreement or any other Loan Document, either by suit in equity or by action at law or under any other agreement including, without limitation, this Note, the Security Agreement, the Loan Agreement or any other Loan Document, either by suit in equity or by action at law.

7.     <u>Payments and Prepayments</u>.  Payments shall be made in lawful tender of the United States.  Borrower shall have the right, at any time, to prepay this Note in whole or any part hereof, but any such prepayments shall be credited first to fees and costs, then accrued interest and then principal.

8.     <u>Successors and Assigns</u>.  The rights and obligations of the Borrower and the holder of this Note shall be binding upon and shall benefit the successors, assigns, heirs, administrators and transferees of the parties.  The Borrower acknowledges that Junior Lender may, upon notice to the Borrower, assign its rights and obligations under this Note and any related documents and agreements, including the right to receive payment hereunder. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Borrower without the prior written consent of the Junior Lender.

9.     <u>Waiver and Amendment</u>.  Any provision of this Note may be amended, waived or modified upon the written consent of the Borrower and Junior Lender.

10.     <u>Notices</u>.  All notices and other communications required or permitted hereunder shall be in writing and shall be hand delivered or sent via facsimile, overnight courier service, electronic email, or mailed by certified or registered mail, postage prepaid, return receipt requested, addressed or sent (i) if to the Junior Lender, at the address first shown above, or at such other address as the Junior Lender shall have furnished to the Borrower in writing, or (ii) if to the Borrower, at the address first shown above, or at such other address as the Borrower shall have

furnished to the Junior Lender in writing. Notices and other communications will be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise, when delivered.

11. <u>Expenses; Waivers</u>. If action is instituted to collect this Note, the Borrower shall pay all of Junior Lender's costs and expenses, including, without limitation, reasonable and documented attorneys' fees and costs, incurred in connection with such action. To the maximum extent permitted by applicable law, the Borrower hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this Note, except such notices as are required from Junior Lender to trigger any applicable cure period.

12. <u>Governing Law</u>. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Washington, without regard to the conflicts of law provisions of the State of Washington or of any other state. The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Note, the Loan Agreement, the Security Agreement or any other Loan Documents.

13. **JURY TRIAL WAIVER. JUNIOR LENDER, BY ITS ACCEPTANCE HEREOF, AND THE BORROWER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT ONE THAT MAY BE WAIVED. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, JUNIOR LENDER AND THE BORROWER WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE JUNIOR SECURED LOAN DOCUMENTS.**

14. **<u>No Oral Agreements</u>. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the undersigned has executed this Brettler Junior Secured Line of Credit Note as of the date first written above.

**WIRELESS ADVOCATES, LLC**
a Washington limited liability Company

By:_____
             Daniel E. Brettler
Its Chairman and CEO

Exhibit C

# JUNIOR SECURED LOAN AGREEMENT

## (Wireless Advocates, LLC)

This JUNIOR SECURED LOAN AGREEMENT (this "Agreement") dated as of December 1, 2022 is between WIRELESS ADVOCATES, LLC ("WA" or the "Borrower") a Washington limited liability company, and Daniel E. Brettler ("Brettler" or the "Junior Lender"), a Washington limited liability company. WA and Brettler are the "Parties" and each a "Party."

## I.     Recitals.

A.     WA is a limited liability company organized under the laws of the state of Washington, with its principal place of business at 400 Fairview Avenue North, Seattle, Washington 98109.

B.     Brettler resides at 4124 55th Avenue East, Seattle, WA 98105 and is the majority shareholder of Car Toys, Inc., a Washington corporation ("CT"), which is in turn the majority member of WA.

C.     U.S. Bank, N.A. (the "Senior Lender") is the senior secured lender to Borrower under that certain line of credit loan, dated as of May 1, 2019 (the "U.S. Bank Secured Line of Credit") and the holder of a valid and perfected first priority security interest (the "Senior Lien") against the "WA Collateral," as defined below.  The Senior Lien is governed by the various promissory notes, loan agreements, security agreements and other documents, all as amended from time to time, including without limitation, that certain Unlimited Guaranty of Brettler in favor of Senior Lender (collectively, the "Senior Secured Loan Documents").

D.     WA is the owner and operator of a wireless cell phone business conducted at various stores owned and operated by Costco Wholesale Corporation ("Costco") or by the U.S. military at various military installations (the "Military").  WA's wireless cell phone business has been hampered by the COVID-19 pandemic, supply chain issues, the global scarcity of micro-chips, a series of unsuccessful or deferred new wireless cell phone product launches, shrinking gross sales margins on wireless phones and carrier network contracts, and various other market factors resulting in its inability to conduct profitable operations and distribute dividends to its members.

E.     Costco has indicated intends to terminate its agreement with WA under its agreement relating to WA's wireless telephone sales and services at Costco stores.  Costco and WA have been attempting, without success to negotiate an amendment to their agreement to provide for the orderly wind down of the relationship provided for in their agreement.

F.     WA's wireless cell phone operations are not sustainable given current market conditions and without the ongoing and uninterrupted sales of phones and network services through Costco.  Accordingly, WA has notified Senior Lender of its planned curtailment and eventual total cessation of operations at Costco and Military stores.

1

G.    WA intends to pay off the Senior Lender under the U.S. Bank Line of Credit (the "Senior Secured U.S. Bank Debt") and terminate the Senior Secured U.S. Bank Debt at or about the time of of entering into this Agreement.  This Agreement is intended to permit WA to fund employee payroll obligations, including without limitation, wages, salaries, benefits and payroll taxes, and to fund other expenses necessary to curtail its operations.

H.    Junior Lender, Borrower, and certain officers of Borrower (the "Individual Indemnitees") have entered into that certain Indemnity Agreement, dated as of August 19, 2022 (the "Indemnity Agreement").

I     Subject to the terms and conditions of this Agreement, the Brettler Secured Line of Credit Note, the Brettler Security Agreement and other related instruments and documents (collectively, the "Junior Secured Loan Documents"), Junior Lender may, in his sole discretion and without obligation of any kind whatsoever, elect from time to time to advance funds to Borrower  (the "Junior Advances" and each a "Junior Advance"), as may be necessary to fund the curtailment of WA's operations and to provide for the orderly liquidation of its assets. Junior Lender's Junior Advances shall be secured by security interests in substantially all the existing and future acquired assets of WA (the "WA Collateral") but such security interests shall be junior in priority to the Senior Lender's security interests in the WA Collateral.

## II.    **Agreement.**

NOW THEREFORE, based upon the mutual agreements and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Junior Lender, intending to be legally bound, hereby agree as follows:

1.    Brettler Junior Secured Line of Credit Loan.

1.1    Discretionary Advances on  Brettler Junior Secured Line of Credit Loan.  Subject to the terms and conditions of this Agreement, and in his sole discretion and without obligation of any kind whatsoever, Junior Lender may make one or more discretionary Junior Advances from time to time.  This credit line shall be evidenced by the Borrower's promissory note  (the "Junior Secured Line of Credit Note"), payable on demand, and in the original face amount of the initial Junior Advance should Junior Lender elect to make such an initial Junior Advance.  The Junior Secured Line of Credit Note may be increased, amended and restated from time to time, should Junior Lender, in his sole discretion, elect to make not only an initial Junior Advance but one or more additional Junior Advances.

1.2    Interest Rate on Junior Secured Line of Credit Loan.  Interest shall accrue at 8.0 percent per annum (the "Contract Rate Interest") on the principal amounts of all Junior Advances under the Junior Secured Line of Credit Note and on the principal amount(s) of any other "Obligations" owed Junior Lender, as that term is defined in the Junior Secured Loan Documents. Upon an Event of Default, additional Default Rate Interest at 5 percent per annum shall also automatically accrue on all such principal amounts.

2

1.3    Demand Obligations.  Subject to the terms and conditions of the Senior Secured Loan Documents governing the payment priority of Senior Secured U.S. Bank Debt, Borrower shall pay to Junior Lender upon his demand all principal, interest and other amounts owing Junior Lender on the Obligations owed to Junior Lender.

1.4  Collateral.  The Junior Line of Credit Loan shall be secured by the WA Collateral.

1.5    Prepayment.  Upon payment in full of the U.S. Bank Senior Secured Line of Credit Loan, the Borrower may prepay the Junior Secured Line of Credit Loan in full or in part at any time without penalty.  Any prepayment will be applied first against expenses and indemnities due hereunder; secondly, against interest due on principal amounts; and thereafter against principal.

1.6    Loan Payments.  All payments by the Borrower on the Junior Secured Line of Credit Loan shall be made in U.S. Dollars and in immediately available funds.

1.7    Use of Funds.  Junior Advances under the Junior Secured Line of Credit Loan shall only be used to defray the following costs:

(a)  employee payroll obligations, including without limitation, wages, salaries, benefits and payroll taxes;

(b) other expenses approved by Junior Lender necessary to curtail WA operations, including the payment of professionals as approved or authorized by Brettler;

(c)  the defense and prosecution of claims and counterclaims pending before the Superior Court of the State of Washington for King County, in Tylt, Inc. vs. Wireless Advocates, LLC, Case No.  20-2-07407-1 SEA (the "Pending Litigation").

1.8    Conditions to Junior Advances.  This Section 1.8 shall govern Junior Advances under the Junior Secured Line of Credit Loan.  Each Junior Advance shall be conclusively deemed to have been authorized and made at the request of and for the benefit of the Borrower when it is credited to any deposit account of Borrower or when such Advance is funded in accordance with the instructions of the Authorized Officer of WA (as defined by resolution of the Board of Managers of WA).

a.    General Conditions to Junior Advances.  Each discretionary Junior Advance requested by Borrower shall be in writing and shall state the amount and purpose of the requested Junior Advance, certifying that each of the following conditions to the requested Junior Advance have been satisfied:

i.    All conditions to closing set forth in Section 6 have been met;

ii.    The Junior Lender and the Authorized Officer of WA have approved and authorized the requested Junior Advance;

iii.    No Event of Default exists under this Agreement or the Junior Secured Loan Documents and no event or circumstance then exists which

3

with notice, the passage of time or both would constitute a default under any of the Junior Secured Loan Documents;

iv.      Junior Lender is not prevented from making advances under the Senior Secured Loan Documents, any applicable law, court order, agreement or otherwise;

v.      No legal or administrative proceeding exists challenging the validity of or seeking to enjoin, set aside, review or otherwise challenge, Junior Lender's security interests securing the Junior Secured Line of Credit Loan; and

vi.      Other than the Pending Litigation, no lawsuit or lawsuits have been filed following the date of this Agreement on behalf of one or more parties against Borrower claiming in an aggregate amount One Hundred Thousand Dollars ($100,000.00) or more in excess of any insurance coverage, and/or which interferes with or threatens to interfere with Borrower's material obligations hereunder.

Unless otherwise agreed by Junior Lender, Junior Advances shall only occur if all the foregoing conditions are met to Lender's satisfaction (or Junior Lender has waived such requirement in writing), and Junior Lender, in its sole discretion and without obligation, shall have elected to make any such Junior Advances requested by Borrower.  Junior Lender, in his sole discretion and without obligation of any kind whatsoever, may elect to make a Junior Advance notwithstanding that any one or more of the foregoing conditions is not satisfied, and by doing so Junior Lender shall not be deemed to have waived his right to require the satisfaction of any such conditions with respect to any other Junior Advance.

2.      <u>Legal Expenses</u>.  The Borrower agrees to promptly reimburse Junior Lender's legal fees and costs incurred in the drafting of this Agreement.  Should Borrower be unable to fund this payment, these fees and costs shall be added to the principal amount of the Junior Secured Line of Credit Loan.

3.      <u>Representations and Warranties</u>.  When Borrower signs this Agreement, and until Junior Lender is repaid in full, the Borrower makes the following representations and warranties to the Junior Lender.

3.1      <u>Recitals</u>.      The above Recitals serve as the basis for this Agreement and are a substantive, contractual part hereof. The Parties each acknowledge and agree that the descriptions, information and factual statements contained in the Recitals are true and correct as of the date hereof and are incorporated within this Agreement and made a part hereof for all purposes as if fully rewritten herein.

3.2      <u>Existence</u>.      The Borrower is a limited liability company formed, in good standing and existing under the laws of the State of Washington.

4

3.3     Authorization. This Agreement, the Junior Secured Loan Documents and any other instruments, agreements, financing statements or other documents which may be required hereunder are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

3.4     Enforceable Agreement.  Each Loan Document is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower and the WA Collateral  in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable.

3.5     Good Standing.  In each jurisdiction in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

3.6     No Conflicts.  No Loan Document conflicts with any law, agreement, or obligation by which the Borrower is bound, with the exception of certain provisions of the Senior Lender Loan Documents, which U.S. Bank has waived in writing.

3.7     No Event of Default.  There is no event which is, or with notice or lapse of time or both would be, an Event of Default under this Agreement.

3.8     Location of Borrower.  The chief executive office of the Borrower is located at the address stated in Recital A above.

4.     Covenants.   Except as otherwise agreed to in writing by Junior Lender and Senior Lender, the Borrower agrees, so long as any amount is owed by Borrower to Senior or Junior Lender under this Agreement, to perform each of the following covenants:

4.1     Use of Proceeds.  To use the proceeds of the Junior Secured Line of Credit Loan only in accordance with the provisions of this Agreement and the Budget.

4.2     Other Liens.  Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except the following (collectively, the "Permitted Liens"):

(a)     liens and security interests in favor of the Junior Lender or Senior Lender;

(b)     liens for taxes not yet due;

(c)     liens outstanding on the date of this Agreement;

(d)     purchase money security interests in assets acquired after the Effective Date of this Agreement in the ordinary course of business or in favor of such other lenders as Junior Lender may consent to for which adequate consideration is received and which do not, in Junior Lender's reasonable discretion, impair or threaten to impair Junior Lender's rights and remedies hereunder or under the Loan Documents; and

(e)     statutory liens of carriers, warehousemen, mechanics, materialmen, bankers and other liens imposed by law and created in the ordinary course of business that are not overdue

by more than 60 days or that are being contested in good faith and as to which adequate reserves have been established in accordance with generally accepted accounting principles.

4.3     Maintenance of Business and Assets

(a)     not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so;

(b)     not to transfer any of the WA Collateral to a trust;

(c)     not to enter into any sale and leaseback agreement covering any of the WA Collateral;

(d)      to maintain and preserve all rights, privileges, and franchises the Borrower now has or hereafter acquires;

(e)     not to declare or pay any distribution either in cash, equity or any other property on Borrower's membership interests now or hereafter outstanding, nor redeem, retire, repurchase or otherwise acquire any interest of any class of Borrower's membership interests now or hereafter outstanding;

(f)     not to pay any compensation, bonus or other financial remuneration to any officer, director, employee or other person other than in the ordinary course of business and as set forth in the approved Budget;

(g)     not to merge into or consolidate with any other entity; and

(h)     not to (i) sell (other than ordinary course sales to customers), assign or otherwise transfer or encumber any intellectual property, (ii) assign or otherwise transfer or encumber this Agreement, or (iii) create an obligation whereby the Borrower is required to pay all or a portion of its earnings to any party in priority to the Junior Lender, without first obtaining the prior written consent of Junior Lender to such sale, assignment, transfer or encumbrance.

4.4     Loans.  Not to make or receive any loans, advances or other extensions of credit, other than the Junior Secured Line of Credit Loan and the Senior Secured Line of Credit Loan, without first obtaining the prior written consent of Junior Lender.

4.5     Notices to Lender.  To promptly notify the Junior Lender in writing of:

(a)     any lawsuit filed or threatened to be filed against the Borrower;

(b)     any material dispute between any governmental authority and the Borrower;

(c)     any Event of Default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an Event of Default;

(d)     any material adverse change in the Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the Junior Secured Line of Credit Loan, based on circumstances not described in the foregoing Recitals;

6

(e)    any change in the Borrower's name, legal structure, states of registration, places of business, or chief executive office, other than those contemplated in the foregoing Recitals; and

(f)    any actual contingent liabilities of the Borrower, and any such contingent liabilities which are reasonably foreseeable.

4.6    <u>Compliance with Laws</u>.  To comply with all applicable laws, regulations, and orders of any governmental authority.

4.7    <u>Books and Records</u>.  To maintain adequate books and records in accordance with generally accepted accounting principles consistently applied, and permit any representative of Junior Lender, at any reasonable time, to inspect, audit and examine such books and records, to make copies of the same, and to inspect the properties of Borrower.

4.8    <u>Perfection of Liens</u>.  To help the Junior Lender perfect and protect his security interests and liens, and reimburse him for related costs he incurs to protect his security interests and liens.

4.9    <u>Cooperation</u>.  To take any action reasonably requested by the Junior Lender to carry out the intent of this Agreement.

4.10    <u>Performance</u>.  To punctually pay all principal, interest or other liabilities due under any of the Junior Secured Loan Documents at the times and place and in the manner specified therein.  To maintain and keep in force, for each business in which the Borrower is engaged, insurance of the types and in amounts customarily carried in similar lines of business.  To pay and discharge when due any and all indebtedness, obligations, assessments and taxes.  To promptly give notice to Junior Lender of any Event of Default with reasonable detail.

5.    <u>Default and Remedies</u>.  If any of the following events of default occurs (each an "<u>Event of Default</u>"), and if capable of cure is not cured within thirty (30) days, Junior Lender may, subject to applicable law, declare the Borrower in default and declare all amounts owing by the Borrower under this Agreement to be due and payable in full, at which time all such amounts will become due and payable without presentment, demand, protest, notice of acceleration, intention  to acceleration or any notice of any kind, all of which are waived by the Borrower.  If any Event of Default occurs, Junior Lender will have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity.  If an Event of Default occurs under the paragraph entitled "Solvency," below, with respect to the Borrower, then, to the extent permitted under applicable law, the entire debt outstanding under this Agreement will automatically be due immediately.

5.1    <u>Failure to Pay</u>. The Borrower fails to pay in full when due any amounts owing to Junior Lender under the Junior Secured Loan Documents or the Indemnity Agreement, including without limitation payment in full of the Junior Secured Line of Credit Loan on demand by Junior Lender.

#5216966 v1 / 32789.001

5.2    Other Nonpayment Defaults.  Any default by Borrower not involving failure to pay occurs under this Agreement, any other Junior Secured Loan Documents or the Indemnity Agreement.

5.3    False Information.    Borrower has given Junior Lender false or misleading information or representations.

5.4    Solvency.  (a) Borrower files a bankruptcy petition, a bankruptcy petition is filed against Borrower, or Borrower makes a general assignment for the benefit of creditors.  The default will be deemed cured if any bankruptcy petition is dismissed with a period of 45 days after the filing; provided, however, that such cure opportunity will be terminated upon the entry of an order for relief in any bankruptcy case arising from such a petition; or (b) a receiver or similar official is appointed for a substantial portion of Borrower's business, or such business is terminated, or, if the Borrower is otherwise liquidated or dissolved.

5.5    Lien Priority.  The Junior Lender fails to have an enforceable lien against the WA Collateral senior in priority to all other liens, security interests, or encumbrances, other than Permitted Liens.

5.6    Lawsuits.  Except for the Pending Litigation, any other lawsuit or lawsuits are filed against Borrower seeking in an aggregate amount of One Hundred Thousand Dollars ($100,000.00) or more in excess of any insurance coverage, and/or which interferes with or threatens to interfere with Borrower's material obligations hereunder.

5.7    Judgments.    Any final judgments or arbitration awards are entered against Borrower, or Borrower enters into any settlement agreements with respect to any litigation or arbitration, in an aggregate amount of Twenty Five Thousand Dollars ($25,000.00) or more in excess of any insurance coverage.

5.8    Material Adverse Change.  A material adverse change occurs, or is reasonably likely to occur, in Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the credit, other than any of the material adverse changes described in the Recitals.

6.  Conditions Precedent.  This Agreement shall not become effective, binding or enforceable unless each of the following conditions precedent is satisfied on or before September 1, , 2022, unless such deadline is waived or extended by the Parties, it being understood and agreed that *time is of the essence* of this Agreement.

6.1    Execution and Delivery of Agreement.  Each Party shall deliver to each other Party counterparts of this Agreement, duly executed by an authorized representative.

6.2    Execution of Other Loan Documents.  Each party to the Junior Secured Loan Documents shall deliver to each other Party counterparts of the Junior Secured Loan Documents, duly executed by an authorized representative.

6.3    Consent By Senior Lender.  Senior Lender shall have delivered its signed consent to Borrower entering into the Junior Secured Loan Documents, in form reasonably satisfactory to

#5216966 v1 / 32789.001

Junior Lender and including such waivers and other terms as Junior Lender may reasonably require.

6.4     Proof of Authorization.  Upon request of a Party, any and all Parties who are entities shall provide copies of such fully and properly executed company resolutions, authorizations, minutes, incumbency certificates or other documents as may be reasonably required to confirm the due authorization and capacity of the Party's undersigned representative to execute and deliver this Agreement.

7.     Intentionally Left Blank.

8.      Miscellaneous Provisions.

8.1  Governing Law; Consent to Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the State of Washington.  To the extent that the Junior Lender has greater rights or remedies under federal law, this paragraph will not be deemed to deprive the Junior Lender of such rights and remedies.  The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Agreement or any other Junior Secured Loan Document.

8.2     Successors and Assigns; Beneficiaries.   This Agreement is binding on the Borrower's and the Junior Lender's successors and assignees.  The Borrower agrees that it may not assign this Agreement.  This Agreement is made and entered into for the sole protection and benefit of the parties hereto and their respective successors and assigns, and no other person or entity shall be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any other Loan Document to which it is not a party.

8.3     Severability; Waivers.  If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced.  The Junior Lender retains all rights, even if he makes a loan after the occurrence of an Event of Default.  If Junior Lender waives an Event of Default, he may enforce a later Event of Default.  Any consent or waiver under this Agreement must be in writing.

8.4     Attorneys' Fees.  The Borrower shall pay to the Junior Lender on demand any and all expenses, including reasonable attorneys' fees and costs, incurred or paid by the Junior Lender in protecting, preserving or enforcing the Junior Lender's rights and remedies under this Agreement or any other Loan Document.

8.5     Notices.  All notices required under this Agreement will be personally delivered or sent by email, first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or to such other addresses as a party may specify from time to time in writing to the other party.  Notices and other communications will be immediately effective upon personal or email delivery or (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise, when delivered.

#5216966 v1 / 32789.001

8.6     Electronic Signatures; Counterparts.    This Agreement may be executed and delivered (including by facsimile or email transmission) in any number of counterparts all of which, taken together, shall constitute the entire agreement between the Parties, all of which shall constitute one Agreement. The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts.  This Agreement may be executed using electronic signatures (PDF) and will be effective and binding as fully as a manually executed instrument. The Parties agree to deliver all original manually signed pages promptly following execution thereof, but any failure to deliver such pages shall not affect the validity or enforceability of this Agreement.

8.7     U.S. Bank Consent.    By signing in the space provided below, U.S. Bank acknowledges and agrees that it has no objection to the Parties entering into and performing under the Junior Secured Loan Documents.

8.8     Construction.    The Parties each acknowledge and agree that it was represented by counsel in connection with the execution and delivery of this Agreement, that it and its counsel reviewed and participated in the preparation and negotiation of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party  shall not be employed in the interpretation of this Agreement.


**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the Borrower and Junior Lender have executed this Agreement as of the date first above written:

| BORROWER: | JUNIOR LENDER: |
|---|---|
| WIRELESS ADVOCATES, LLC, a Washington limited liability company | By:_____ Daniel E. Brettler 4124 55th Avenue East Seattle, WA 98105 Email: dbrettler@cartoys.com |
| By:_____ Daniel E. Brettler Its: Chairman and CEO 400 Fairview Avenue North Seattle, Washington 98109 Email: dbrettler@cartoys.com | |

Exhibit D

# BRETTLER SECURITY AGREEMENT

This Brettler Security Agreement (the "<u>Agreement</u>") dated as of December 1, 2022 is given by Wireless Advocates, LLC, a Washington limited liability company ("<u>WA</u>" or "<u>Borrower</u>") in favor of Daniel E. Brettler ("<u>Brettler</u>" or "<u>Junior Lender</u>").  Capitalized Terms not otherwise defined herein shall have the same meaning as is provided in that certain Brettler Junior Secured Loan Agreement (the "<u>Junior Secured Loan Agreement</u>") of even date by and between Borrower and Junior Lender  or by the UCC (as defined below), as the case may be (such meanings to be equally applicable to both the singular and plural forms of the terms defined).  Borrower and Junior Lender are "<u>Parties</u>" and each a "<u>Party</u>" to this Agreement, the Junior Secured Loan Agreement, the Brettler Security Agreement and various other loan documents (collectively, the "<u>Junior Secured Loan Documents</u>").

## I.  <u>Recitals.</u>

A.      WA is a limited liability company organized under the laws of the state of Washington, with its principal place of business at 400 Fairview Avenue North, Seattle, Washington 98109.

B.      Brettler resides at 4124 55th Avenue East, Seattle, WA 98105 and is the majority shareholder of Car Toys, Inc., a Washington corporation ("CT"), which is in turn the majority member of WA.

C.      U.S. Bank, N.A. (the "<u>Senior Lender</u>") is the senior secured lender to Borrower under that certain line of credit loan, dated as of May 1, 2019 (the "<u>U.S. Bank Senior Secured Line of Credit</u>") and the holder of a valid and perfected first priority security interest (the "<u>Senior Lien</u>") against the "Collateral," as defined below.  The Senior Lien is governed by the various promissory notes, loan agreements, security agreements and other documents, all as amended from time to time, including without limitation, that certain Unlimited Guaranty  of Brettler in favor of Senior Lender (collectively, the "<u>Senior Secured Loan Documents</u>").

D.      WA is the owner and operator of a wireless cell phone business conducted at various stores owned and operated by Costco Wholesale Corporation ("<u>Costco</u>") or by the U.S. military at various military installations (the "<u>Military</u>").  WA's wireless cell phone business has been hampered by the COVID-19 pandemic, supply chain issues, the global scarcity of micro-chips, a series of unsuccessful or deferred new wireless cell phone product launches, shrinking gross sales margins on wireless phones and carrier network contracts, and various other market factors resulting in its inability to conduct profitable operations and distribute dividends to its members.

E.      Costco has indicated intends to terminate its agreement with WA under its agreement relating to WA's wireless telephone sales and services at Costco stores.  Costco and WA have been attempting, without success to negotiate an amendment to their agreement to provide for the orderly wind down of their relationship as provided for in their agreement.

#5155383 v1 / 74115-001

G. WA intends to pay off the Senior Lender under the U.S. Bank Line of Credit (the "Senior Secured U.S. Bank Debt") and terminate the Senior Secured U.S. Bank Debt at or about the time of of entering into this Agreement. This Agreement is intended to permit WA to fund employee payroll obligations, including without limitation, wages, salaries, benefits and payroll taxes, and to fund other expenses necessary to curtail its operations.

H. Junior Lender, Borrower, and certain officers of Borrower (the "Individual Indemnitees") have entered into that certain Indemnity Agreement, dated as of August 19, 2022 (the "Indemnity Agreement").

I. Subject to the terms and conditions of this Agreement, Junior Lender may advance the funds (the "Junior Advances as may be necessary to fund payment of WA's wireless phone operations, during their curtailment and pending their complete termination and the orderly liquidation of its assets.

## II. Agreement.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. Definitions. The following words will have the following meanings when used in this Agreement. Capitalized terms not defined shall have the meanings provided to them in the Uniform Commercial Code, RCW 62A.9A-102 or in the Junior Secured Loan Agreement. All references to dollar amounts will mean amounts in lawful money of the United States of America.

1.1 "Collateral" means:

All the following described property of the Borrower, whether now owned or hereafter acquired, whether now existing or hereafter arising, wherever located and any accessions thereto or proceeds therefrom:

(a) All General Intangibles, Payment Intangibles, Inventory, Equipment, Chattel Paper (whether tangible or electronic), Commercial Tort Claims, Deposit Accounts, documents, goods, Instruments, Investment Property, Letter-of-credit Rights, letters of credit and money;

(b) All Fixtures, Records and Goods of every kind and nature including without limitation Inventory and Equipment);

(c) All Accounts (including all Receivables), contract rights or rights to the payment of money and insurance claims and proceeds;

(d) All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, including without limitation Commercial Tort Claims;

2

(e)  All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records"); and

(f)  All Intellectual Property Collateral, as defined herein.

1.2    "Copyrights" means, collectively, with respect to Borrower, all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all tangible embodiments of the foregoing and all copyright registrations and applications made by Borrower, in each case, whether now owned or hereafter created or acquired by or assigned to Borrower, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

1.3    "Deposit Account Control Agreement" means an agreement providing Junior Lender control over any Deposit Account of Borrower and in form reasonably satisfactory to Junior Lender and sufficient under the UCC to perfect Junior Lender's security interest in all such Deposit Accounts of Borrower.

1.4    "Event of Default" means Borrower's failure to pay or perform any of the Obligations as and when due to be paid or performed under this Agreement or under any of the Junior Secured Loan Documents.  .

1.5    "Intellectual Property Collateral" means, collectively, the Patents, Trademarks (excluding only United States intent-to-use Trademark applications to the extent that and solely during the period in which the grant of a security interest therein would impair, under applicable federal law, the registrability of such applications or the validity or enforceability of registrations issuing from such applications), Copyrights, Software, Trade Secrets, Intellectual Property Licenses and all other industrial, intangible and intellectual property of any type, including mask works and industrial designs.

1.6    "Intellectual Property Licenses"  means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property Collateral owned by WA.

1.7    "Obligations" means any and all debts, liabilities, and obligations of the Borrower to the Junior Lender, now or hereafter existing and however, whether voluntary or involuntary, direct or indirect or acquired by Junior Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by the Junior Lender for its own account or as agent for another

3

or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. The "Obligations" include, without limitation, any and all existing and future Obligations under the Junior Secured Loan Documents and the Indemnity Agreement as well as any and all other existing or future obligations of the Borrower to the Junior Lender for reasonable attorneys' fees and all other costs and expenses incurred by Junior Lender however arising, including those relating to the creation, collection or enforcement of any debts, liabilities, or obligations of the Borrower to the Junior Lender, U.S. Bank and any other parties.

1.9    "Patents" means, collectively, with respect to Borrower, all patents issued or assigned to, and all patent applications and registrations made by Borrower, whether issued, established or registered or recorded in the United States or any other country or any political subdivision thereof and all tangible embodiments of the foregoing, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

1.10    "Receivables" means all (i) Accounts, (ii) Chattel Paper, (iii) Payment Intangibles, (iv) Instruments, and (v) to the extent not otherwise covered above, all other rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the UCC together with all of Borrower's rights, if any, in any goods or other property giving rise to such right to payment and all collateral or other supporting obligations related thereto and all Records relating thereto.

1.11    "Trade Secrets" means, collectively, with respect to Borrower, all know-how, business secrets, manufacturing and production processes and techniques, inventions, research and development information, technical, marketing, financial and business data and databases, pricing and cost information, business and marketing plans, customer and supplier lists and information, all other confidential and proprietary information and all tangible embodiments of the foregoing, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to such trade secrets, (ii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto including damages and payments for past, present or future misappropriations thereof, (iii) rights corresponding thereto throughout the world and (iv) rights to sue for past, present or future misappropriations thereof.

1.12    "Trademarks" means, collectively, with respect to Borrower, all trademarks (including service marks), slogans, logos, symbols, certification marks, collective marks, trade dress, uniform resource locators (URL's), domain names, corporate names and trade names,

whether statutory or common law, whether registered or unregistered and whether established or registered in the United States or any other country or any political subdivision thereof, including those listed in the schedule attached to that certain Trademark Security Agreement, dated as of June 14, 2018, that are owned by or assigned to Borrower, all registrations and applications for the foregoing and all tangible embodiments of the foregoing, together with, in each case, the goodwill symbolized thereby and any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

       1.13   "<u>Security Agreement</u>" means this Agreement, as amended, restated and supplemented by this Agreement, and as may be further amended or modified from time to time, together with all exhibits and schedules attached to this Security Agreement from time to time.

       1.14   "<u>Source Code Escrow Agreement</u>" means an agreement for placing and maintaining software source code, documentation, and related materials in escrow with a third-party escrow agent under the terms of a software license agreement, with instructions on how to adapt the agreement for use under a software as a service (SaaS) agreement.

       1.15   "<u>Uniform Commercial Code</u>" or "<u>UCC</u>" shall mean the Washington Uniform Commercial Code, Title 62A RCW, Chapter 9A, as amended from time to time, or any successor provisions of law.

       2.   <u>Grant of Security Interest</u>.

For valuable consideration, the Borrower (1) grants to the Junior Lender a security interest in the Collateral to secure the Obligations, (2) agrees that the Junior Lender will have the rights stated in this Security Agreement with respect to the Collateral, in addition to all other rights which the Junior Lender may have under any existing documents or by applicable law, and (3) agrees to be bound by the provisions of this Agreement. Except for the Permitted Liens, including the security interests held by Senior Lender against the Collateral, the security interests granted herein shall be senior in priority to any and all other security interests in the Collateral and any of Borrower's existing or future assets. This Agreement is subject to the terms of the Junior Secured Loan Agreement between Borrower and Lender of even date herewith, as it may be amended from time to time.

       3.   <u>Representations, Warranties and Covenants of Borrower</u>.

       3.1   <u>Recitals</u>.   The above Recitals serve as the basis for this Agreement and are a substantive, contractual part hereof. The Parties each acknowledge and agree that the descriptions, information and factual statements contained in the Recitals are true and correct as of the date hereof and are incorporated within this Agreement and made a part hereof for all purposes as if fully rewritten herein.

#5155383 v1 / 74115-001

3.2    Organization.  The Borrower is a limited liability company organized, validly existing and in good standing under the laws of the State of Washington, and has its principal office at 400 Fairview Avenue North, Seattle, WA 98109.

3.3    Authorization.  The execution, delivery, and performance of this Agreement by the Borrower has been duly authorized by all necessary action by the Borrower and does not conflict with, result in a violation of, or constitute a default under (a) any provision of its certificate of formation, operation agreement, or any agreement or other instrument governing or binding upon the Borrower or (b) any law, government regulation, court decree, or order applicable to Borrower.

3.4    Perfection of Security Interests.  Borrower consents to Junior Lender filing financing statements and otherwise agrees to take whatever other actions are requested by the Junior Lender to perfect and continue the Junior Lender's senior priority security interests in the Collateral.  Upon request of the Junior Lender, and to the extent necessary to perfect Junior Lender's interests therein, the Borrower shall deliver to the Junior Lender any and all of the documents evidencing or constituting the Collateral or such other documents or information as Junior Lender may reasonably require for this purpose.  The Borrower hereby appoints the Junior Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement.  The Borrower will immediately notify the Junior Lender of any change in the Borrower's name, including any change to the assumed business names of the Borrower or any change in its state of organization.  The Borrower will also immediately notify the Junior Lender of any change in the location of the Borrower or the Collateral.  This Agreement is a continuing security agreement and will continue in effect even though all or any part of the Obligations are paid in full.

3.5    Transactions Involving Collateral.  Without Junior Lender's prior written consent, Borrower will not sell or otherwise transfer or dispose of the Collateral, except that the Borrower may sell inventory, machinery and equipment in the ordinary course of business.  The Borrower will not pledge, mortgage, lease, assign, license, rent, subordinate, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of the Junior Lender.  This prohibition includes security interests even if junior in right to the security interests granted under this Agreement.

3.6    Collateral Schedules and Locations.  The Borrower will deliver to the Junior Lender, as often as the Junior Lender will reasonably require, such schedules, lists, descriptions, and designations of such Collateral as the Junior Lender may require to identify the location, nature and extent of such Collateral.

3.7    Status of Collateral.  The Collateral may not be utilized in any way by anyone, except the Borrower, without the Junior Lender's prior written consent.  The Borrower will immediately notify the Junior Lender of all cases involving the return, rejection, repossession, loss or damage of or to any Collateral of any request for credit or adjustment or of any other dispute rising with respect to the Collateral; and generally of all happenings and events affecting the

6

Collateral or the value or the amount of the Collateral. The Borrower will not seek the reissuance of any certificate or other evidence of the Collateral from any governmental entity without the Junior Lender's written consent. The Borrower will not enter into any Intellectual Property Licenses or sale agreement outside the ordinary course of business relating to the Collateral without Junior Lender's written consent.

Borrower agrees that the Junior Lender may at its option at any time, whether or not the Borrower is in default:

(a) Require the Borrower to deliver to the Junior Lender (i) copies of or extracts from the Borrower's books and records, and (ii) information on any contracts, applications or other matters affecting the Collateral;

(b) Examine the Collateral, including the books and records, and make copies of or extracts from the books and records, and for such purposes enter at any reasonable time upon the property where any Collateral or any books and records are located;

(c) Require the Borrower to deliver to the Junior Lender any Instruments, Chattel Paper or Letters of Credit which are part of the Collateral, and to assign to the Junior Lender the proceeds of any such Letters of Credit (provided that so long as there is not an Event of Default, the foregoing obligations shall only be to the extent necessary to perfect Junior Lender's obligation in such Collateral); and/or

(d) Notify any account Borrowers, any buyers, assignees or licensees of the Collateral, or any other persons of the Junior Lender's interest in the Collateral.

3.8 <u>Maintenance of Collateral</u>. Borrower shall maintain and preserve the Collateral and shall pay when due all taxes or other fees and costs required to be paid to a governmental entity to preserve the validity and enforceability of the Borrower's Intellectual Property Collateral and prevent the attachment of any liens or encumbrances against the Collateral, including without limitation the Intellectual Property Collateral.

3.9 <u>Authorization to File Financing Statements and Other Notice Filings</u>. The Borrower hereby irrevocably authorizes the Junior Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of Washington, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of Washington, or such other jurisdiction, for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Borrower is an organization, the type of organization and any organizational identification number issued to the Borrower. The Borrower agrees to furnish any such information to the Junior Lender promptly upon the Junior Lender's request. Borrower

3.11 <u>Taxes, Assessments and Liens</u>. All taxes, assessments and liens upon the Collateral, its use or operation will be paid in accordance with law. Borrower may withhold any

such payment or may elect to contest any lien if the Borrower is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as the Junior Lender's interest in the Collateral is not jeopardized, in Junior Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within 30 days, the Borrower will deposit with the Junior Lender cash (other than cash which is itself Collateral of Junior Lender or the proceeds of an advance under the Junior Secured Line of Credit Loan), a sufficient corporate surety bond or other additional security satisfactory to the Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest, Borrower will defend itself and the Junior Lender and will satisfy any final adverse judgement before enforcement against the Collateral. The Borrower will name the Junior Lender as an additional obligee under any surety bond furnished.

3.12    Compliance with Governmental Requirements.    Borrower will comply promptly with all laws, ordinances and regulations of all governmental authorities applicable to the production, disposition, or use of the Collateral. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as the Junior Lender's interest in the Collateral, in Junior Lender's opinion, is not jeopardized.

3.13    Other Actions.    To further the attachment, perfection and first priority of, and the ability of the Junior Lender to enforce, the Junior Lender's security interest in the Collateral, and without limitation on the Borrower's other obligations in this Agreement, and except to the extent prohibited by a term or provision of the Senior Secured Loan Documents not waived in writing by the Senior Lender, the Borrower agrees, in each case at the Borrower's expense, to take the following actions with respect to the following Collateral:

a.    Promissory Notes and Tangible Chattel Paper.    If the Borrower shall at any time hold or acquire any promissory notes or tangible chattel paper, the Borrower shall forthwith endorse, assign and deliver the same to the Junior Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Junior Lender may from time to time specify.

b.    Deposit Accounts.    For each deposit account that the Borrower at any time opens or maintains, the Borrower shall, at the Junior Lender's request and option, pursuant to a Deposit Account Control Agreement in form and substance satisfactory to the Junior Lender, either (a) cause the depositary bank to comply at any time with instructions from the Junior Lender to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of the Borrower, or (b) arrange for the Junior Lender to become the customer of the depositary bank with respect to the deposit account, with the Borrower being permitted, only with the consent of the Junior Lender, to exercise rights to withdraw funds from such deposit account. The Junior Lender agrees with the Borrower that the Junior Lender shall not give any such instructions or withhold any withdrawal rights from the Borrower, unless an Event of Default has occurred and is continuing, or would occur, if effect were given to any withdrawal not otherwise permitted by the Junior Secured Loan Documents. The provisions of this paragraph shall not apply to (i) any deposit account for which the Borrower, the depositary bank

8

and the Junior Lender have entered into a cash collateral agreement specially negotiated among the Borrower, the depositary bank and the Junior Lender for the specific purpose set forth therein, and (ii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Borrower's salaried employees.

      c.    <u>Investment Property</u>. If the Borrower shall at any time hold or acquire any certificated securities, the Borrower shall forthwith endorse, assign and deliver the same to the Junior Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Junior Lender may from time to time specify. If any securities now or hereafter acquired by the Borrower are uncertificated and are issued to the Borrower or its nominee directly by the issuer thereof, the Borrower shall immediately notify the Junior Lender thereof and, at the Junior Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Junior Lender, either (a) cause the issuer to agree to comply with instructions from the Junior Lender as to such securities, without further consent of the Borrower or such nominee, or (b) arrange for the Junior Lender to become the registered owner of the securities. If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by the Borrower are held by the Borrower or its nominee through a securities intermediary or commodity intermediary, the Borrower shall immediately notify the Junior Lender thereof and, at the Junior Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Junior Lender, either (i) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply with entitlement orders or other instructions from the Junior Lender to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by the Junior Lender to such commodity intermediary, in each case without further consent of the Borrower or such nominee, or (ii) in the case of financial assets or other investment property held through a securities intermediary, arrange for the Junior Lender to become the entitlement holder with respect to such investment property, with the Borrower being permitted, only with the consent of the Junior Lender, to exercise rights to withdraw or otherwise deal with such investment property. The Junior Lender agrees with the Borrower that the Junior Lender shall not give any such entitlement orders or instructions or directions to any such issuer, securities intermediary or commodity intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by the Borrower, unless an Event of Default has occurred and is continuing, or, after giving effect to any such investment and withdrawal rights not otherwise permitted by the Loan Documents, would occur.

      d.    <u>Collateral in the Possession of a Bailee</u>. If any Collateral is at any time in the possession of a bailee, the Borrower shall promptly notify the Junior Lender thereof and, at the Junior Lender's request and option, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to the Junior Lender, that the bailee holds such Collateral for the benefit of the Junior Lender, and that such bailee agrees to comply, without further consent of the Borrower, with instructions from the Junior Lender as to such Collateral. The Junior Lender agrees with the Borrower that the Junior Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Borrower with respect to the bailee.

9

e.     Commercial Tort Claims.  If the Borrower shall at any time hold or acquire a Commercial Tort Claim, the Borrower shall immediately notify the Junior Lender in a writing signed by the Borrower of the particulars thereof and grant to the Junior Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Junior Lender.  Borrower shall also immediately execute or otherwise authenticate a supplement to this Agreement, and otherwise take all necessary actions to subject such Commercial Tort Claim to the first priority security interest created under this Agreement.

f.     Insurance.  The Borrower will maintain with financially sound and reputable insurers liability insurance with respect to its managers and officers, and casualty insurance as to the Collateral, its properties and business, in such amounts and subject to such terms as are consistent with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts that the Borrower will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Junior Lender.  In addition, all such insurance shall be payable to the Junior Lender as loss payee under a standard loss payee clause.  Without limiting the foregoing, the Borrower will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverages and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property, (ii) maintain all such workers' compensation or similar insurance as may be required by law, and (iii) maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring, on, in or about the properties of the Borrower; business interruption insurance; and product liability insurance.

i.     Insurance Proceeds.  The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, (i) so long as no Event of Default has occurred and is continuing and to the extent that the amount of such proceeds is less than $50,000, be disbursed to the Borrower for direct application by the Borrower solely to the repair or replacement of the Collateral so damaged or destroyed, and (ii) in all other circumstances, at Junior Lender's election be held by Junior Lender as cash collateral for the Obligations.  The Junior Lender may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Junior Lender may reasonably prescribe, for direct application by the Borrower solely to the repair or replacement of the Borrower's property so damaged or destroyed, or the Junior Lender may apply all or any part of such proceeds to the Obligations.

#5155383 v1 / 74115-001

j.     Continuation of Insurance.  All policies of insurance shall provide for at least 30 days prior written cancellation notice to the Junior Lender.  In the event of failure by the Borrower to provide and maintain insurance as herein provided, the Junior Lender may, at its option, provide such insurance and charge the amount thereof to the Borrower.  The Borrower shall furnish the Junior Lender with certificates of insurance and policies evidencing compliance with its foregoing insurance obligations.

4.     Expenditures by Lender.  If not discharged or paid when due, the Junior Lender may (but will not be obligated to) discharge or pay any amounts required to be discharged or paid by the Borrower under this Agreement, including without limitation all taxes, liens, security interests, encumbrances, and other claims, at any time levied or placed on the Collateral.  Junior Lender also may (but will not be obligated to) pay all costs for maintaining and preserving the Collateral.  All such expenditures incurred or paid by the Junior Lender for such purposes will then bear interest at the rate of 8% per annum from the date incurred or paid by the Junior Lender to the date of repayment by the Borrower.  All such expenses will be payable upon demand by the Borrower or, at Junior Lender's election, may be advanced by him.  This Agreement also will secure Borrower's payment of these amounts.  Such right will be in addition to all other rights and remedies to which the Junior Lender may be entitled upon the occurrence of an Event of Default.

5.     Rights and Remedies on Event of Default.  If an Event of Default occurs under any of the Junior Secured Loan Documents, and subject to any and all countervailing requirements of the Senior Secured Loan Documents, the Lender: (a) will have all of the rights of a secured lender under the UCC; and (b) in addition and without limitation to the foregoing, may exercise any one or more of the following rights and remedies, in addition to any granted in any other Junior Secured Loan Documents:

5.1     Assemble Collateral.  The Junior Lender may require the Borrower to deliver to the Junior Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral.  The Junior Lender may require the Borrower to assemble the Collateral and make it available to the Junior Lender at a place to be designated by the Junior Lender.

5.2     Preservation of Collateral.  The Junior Lender may enter upon the property where any Collateral, including any books and records, are located and take possession of such Collateral and such books and records, and use such property (including any buildings and facilities) and any of the Borrower's equipment, if the Junior Lender reasonably deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and use or transfer any of the Borrower's rights and interests in any intellectual property now owned or hereafter acquired by Borrower, if the Junior Lender reasonably deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.  The Borrower agrees that any such use or transfer shall be without any additional consideration to Borrower.

#5155383 v1 / 74115-001

5.3    Sell the Collateral.  The Junior Lender will have full power to sell, lease, license, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of the Borrower.  The Junior Lender may sell the Collateral at public auction or private sale.  The Borrower hereby appoints the Junior Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to sell, lease, transfer or otherwise deal with the Collateral or proceeds thereof.  Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Junior Lender will give the Borrower reasonable notice of the time after which any private sale or other intended disposition of the Collateral is to be made.  The requirements of reasonable notices will be met if such notice is given at least 10 days before the time of the sale or disposition.  All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, will become a part of the Obligations secured by this Agreement and will be payable on demand by the Borrower, with interest at the rate stated in the Junior Secured Loan Agreement from the date of expenditure until repaid.

5.4    Appoint Receiver.  In addition to all other remedies herein provided for, Borrower agrees that upon the occurrence of an Event of Default, or any event or circumstance which, with the lapse of time or the giving of notice, or both, would constitute an Event of Default, the Junior Lender as a matter of contract right shall be entitled to the appointment of a general receiver for the Borrower, or an in rem receiver or receivers for all or any part of the Collateral, at Junior Lender's election and in its sole discretion, and whether such receivership be incident to a proposed sale of such property or otherwise, and without regard to the value of the Collateral or the solvency of the Borrower.  Borrower consents to the appointment of such receiver or receivers without bond, waives any and all defenses to such appointment and agrees not to oppose any application therefor by the Junior Lender.  Borrower acknowledges Junior Lender owes no duty to arbitrate any disputes relating to, or arising under, this Agreement or any of the Junior Secured Loan Documents, including without limitation Junior Lender's right to the appointment of a receiver as provided herein. Nothing in this Agreement shall be construed as depriving the Junior Lender of any of its rights, remedies and privileges it now holds or in the future may hold under applicable law to have a general or in rem receiver appointed pursuant to RCW 7.60.025 as a matter of right; provided, however, that the appointment of such receiver by virtue of any court order, statute or regulation shall  not impair or  in  any manner prejudice the  rights  of the  Junior Lender to receive any and all rents, income or proceeds from the Collateral. Any money advanced by the Junior Lender in connection with any receivership shall be a demand obligation owing by Borrower to the Junior Lender and shall bear interest from the date of such advance until paid at the Default Rate of 13 per cent per annum and shall be a part of the Obligations secured by the Collateral.

5.5    Collect Revenues, Apply Accounts.  The Junior Lender, either itself or through a receiver, may collect the payments, rents, income, proceeds, and revenue from the Collateral.  The Junior Lender may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as the Junior Lender may determine.  For these purposes, the Junior Lender may on behalf of and

12

in the name of the Borrower, endorse note, checks, drafts, money orders, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, the Junior Lender may notify Borrower's account Borrowers and obligors on any Collateral to make payments directly to the Junior Lender.

5.6    Other Rights and Remedies.  The Junior Lender will have all the rights and remedies of a secured creditor under the provisions of the UCC.  In addition, the Junior Lender will have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

5.7    Cumulative Remedies.  All of the Junior Lender's rights and remedies, whether evidenced by this Agreement or the Junior Secured Loan Documents or by any other writing or as provided by law, will be cumulative and may be exercised singularly or concurrently.  Election by the Junior Lender to pursue any remedy will not exclude pursuit of any other remedy, and an election to make expenditure or to take action to perform an obligation of the Borrower under this Agreement, after the Borrower's failure to perform, will not affect the Junior Lender's right to declare a default and to exercise its remedies.

5.8    Marshalling.  The Junior Lender shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.  To the extent that it lawfully may, the Borrower hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Junior Lender's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Borrower hereby irrevocably waives the benefits of all such laws.

6.    Miscellaneous Provisions.

6.1    Entire Agreement.  This Agreement contains the complete, full, and exclusive understanding of the Parties as to its subject matter.  Any amendments to this Agreement shall be effective and binding on the Parties only if any such amendments are in writing and signed by the authorized representatives of both Parties.

6.2    Notices.  All notices required to be given under this Agreement will be given in writing and will be effective when actually delivered or when deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address in the Junior Secured Loan Agreement.  Any party may changes its address for notices under this Agreement by giving formal written notice to the other party, specifying that the purpose of the notice is to change the party's address.  For notice purposes, the Borrower agrees to keep the Junior Lender informed at all times of the Borrower's current address.

6.3     Severability.  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding will not render that provision invalid or unenforceable as to any other persons or circumstances.  If feasible, any such offending provision will be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it will be stricken and all other provisions of this Agreement in all other respects will remain valid and enforceable.

6.4     Lender Successor Interests; Nonassignability of Borrower's Interests. Subject to the limitations set forth above on transfer of the Collateral, this Agreement will be binding and inure to the benefit of the Junior Lender, its successors and assigns.   Borrower acknowledges and agrees its rights under this Agreement as well as any other Junior Secured Loan Document may not be assigned in whole or part.

6.5     Waiver.  The Junior Lender and the Borrower will not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by the party against whom enforcement is sought.  No delay or omission on the part of the Junior Lender or the Borrower in exercising any right will operate as a waiver of such right or any other right.  A waiver by the Junior Lender or the Borrower of a provision of this Agreement will not prejudice or constitute a waiver of the Junior Lender's or the Borrower's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by the Junior Lender or the Borrower, nor any course of dealing between the Junior Lender and the Borrower, will constitute a waiver of any of the Junior Lender's or the Borrower's rights or of any of the Junior Lender's or the Borrower's obligations as to any future transactions.  Whenever the consent of the Lender or the Borrower is required under this Agreement, the granting of such consent by the Junior Lender or the Borrower in any instance will not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Junior Lender or the Borrower.

6.6     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Washington.  To the extent that the Junior Lender has greater rights or remedies under the federal law of the United States of America, this paragraph will not be deemed to deprive the Junior Lender of such rights and remedies as may be available under the federal law of the United States of America.

6.7     Attorney's Fees and Costs.    The Borrower shall pay to the Junior Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Junior Lender in protecting, preserving or enforcing the Junior Lender's rights and remedies under or in respect of any of the Obligations or any of the Collateral.

6.8     Electronic Execution; Counterparts.  This Agreement may be executed and delivered (including by facsimile or email transmission) in any number of counterparts all of which, taken together, shall constitute the entire agreement between the Parties, all of which shall constitute one Agreement. The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts.  This Agreement may be executed

using electronic signatures (PDF) and will be effective and binding as fully as a manually executed instrument. The Parties agree to deliver all original manually signed pages promptly following execution thereof, but any failure to deliver such pages shall not affect the validity or enforceability of this Agreement.

6.9     Waiver of Jury Trial.  THE BORROWER WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE JUNIOR SECURED LOAN DOCUMENTS, OR ANY RIGHTS, REMEDIES, OBLIGATIONS, OR DUTIES HEREUNDER OR THEREUNDER, OR THE PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.  Except as prohibited by law, the Borrower waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.  The Borrower (i) certifies that neither the Junior Lender nor any representative, agent or attorney of the Junior Lender has represented, expressly or otherwise, that the Junior Lender would not, in the event of litigation, seek to enforce the foregoing waivers or other waivers contained in this Agreement, and (ii) acknowledges that, in entering into the Junior Secured Loan Agreement and the other Junior Secured Loan Documents to which the Junior Lender is a party, the Junior Lender is relying upon, among other things, the waivers and certifications contained in this section.

6.10    Venue and Consent to Jurisdiction.  The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document.

6.11.   Construction.  In the event of any conflict between the terms of this Agreement and the Junior Secured Loan Agreement, the terms of the Loan Agreement shall control.   The Parties each acknowledge and agree that he and it were represented by independent counsel in connection with the negotiation, execution and delivery of this Agreement, who reviewed and participated in the preparation and negotiation of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

*[Signatures on following page]*

#5155383 v1 / 74115-001

EXECUTED as of the day and year first set forth above.

| BORROWER: | JUNIOR LENDER: |
|---|---|
| Wireless Advocates, LLC, a Washington limited liability company<br><br>_____<br>By: Daniel Brettler,<br>Its: Chairman and Chief Executive Officer | _____<br>Daniel Brettler |

#5155383 v1 / 74115-001

Exhibit E

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Ashley R. Gordon 2062-24-8144

**B. E-MAIL CONTACT AT FILER** (optional)
agordon@karrtuttle.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Karr Tuttle Campbell
701 Fifth Avenue, Suite 3300
Seattle WA USA 98104

**Date of Filing :** 08/15/2022
**Time of Filing :** 04:05:00 PM
**File Number    :** 2022-227-6099-5
**Lapse Date     :** 08/15/2027

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Wireless Advocates LLC | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 400 Fairview Ave N, Suite 900 | Seattle | WA | 98109 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| Brettler | Daniel E. | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4124 55th Ave N.E. | Seattle | WA | 98105-4946 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

All assets whether now owned or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
32789-1

Exhibit F

# INDEMNIFICATION AGREEMENT

9/13/2022

This Indemnification Agreement (*"**Agreement**"*) is made and entered into as of [●] by and between Dan Brettler, (*"**Brettler**"*), an individual and Wireless Advocates, LLC, a Washington limited lability (the *"**Company**"* and collectively with Brettler the *"**Indemnitors**"*), and ▮▮▮▮▮▮▮▮▮▮▮▮, an individual (*"**Indemnitee**"*).

Kimberly Nelson

## RECITALS

A.  Indemnitee is currently serving as an officer of the Company and in such capacity is performing valuable services for the Company.

B.  Brettler is the CEO of the Company and the largest equity holder.

C.  The members of the Company have adopted Bylaws (the *"**Bylaws**"*) providing the indemnification of the directors and officers of the Company to the full extent permitted under Washington law.

D.  The Bylaws and the Washington Limited Liability Company Act (the *"**Statute**"*) specifically provide that they are not exclusive, and thereby contemplate that contracts may be entered into between the Company and the members of its Board of Directors and its officers with respect to indemnification of such directors and officers.

E.  The Indemnitors and Indemnitee recognize the increasing difficulty in obtaining directors' and officers' liability insurance, the significant increases in the cost of such insurance and the general reduction in the coverage of such insurance.

F.  The Indemnitors and Indemnitee further recognize the substantial increase in litigation subjecting officers and directors to expensive litigation risks at the same time that such liability insurance has been severely limited.

G.  Indemnitee does not regard the current protection available as adequate given the present circumstances, and Indemnitee may not be willing to serve as an officer without adequate protection.

H.  The Company desires to retain the services of highly qualified individuals, such as Indemnitee, to serve as officers and directors of the Company and to indemnify its officers so as to provide them with the maximum protection permitted by law.

I.  In order to induce Indemnitee to continue to serve as an officer of the Company and in consideration for her continued service, Indemnitors have determined and agreed to enter into this Agreement with Indemnitee.

– 1 –

<u>AGREEMENT</u>

In consideration of the recitals above and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. **RIGHT TO INDEMNIFICATION.** Indemnitors shall indemnify Indemnitee if Indemnitee was or is made a party or is threatened to be made a party to or is otherwise involved (including, without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal (hereinafter a "proceeding"), by reason of the fact that Indemnitee is or was a director or officer of the Company or that, while serving as a director or officer of the Company, Indemnitee is or was providing services to Car Toys under the Shared Services Agreement between the Company and Car Toys, shall be indemnified and held harmless by the Indemnitors against all expense, liability and loss (including attorneys' fees, judgment, fines, ERISA excise taxes or penalties and amounts paid in settlement) actually and reasonably incurred or suffered by Indemnitee (hereinafter "expenses") in connection therewith; provided, however, that (a) the Indemnitors shall not indemnify Indemnitee from or on account of any act or omission of Indemnitee to the extent indemnification for such act or omission is specifically prohibited by RCW 25.15.041 or any successor provision of the Statute; and (b) except as provided in Section 2.1 hereof with respect to proceedings seeking to enforce rights to indemnification, Indemnitors shall indemnify Indemnitee in connection with a proceeding (or part thereof) initiated by Indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Company. Such indemnification shall continue as to Indemnitee after Indemnitee has ceased to be a director, officer, employee or agent and shall inure to the benefit of Indemnitee's heirs, successors and administrators. The right to indemnification conferred in this Section 1 shall include the right to be paid by the Indemnitors the expenses incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that an advancement of expenses incurred by Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Company of an undertaking (hereinafter an "undertaking"), by or on behalf of Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that Indemnitee is not entitled to be indemnified for such expenses under this Section 1 or otherwise and upon the taking of such other action, if any, as may be required by the Statute. The requirement to indemnify Indemnitee under this Agreement is joint and several as between the Indemnitors. If either Indemnitor is unable or unwilling to fulfill its obligations hereunder, the other Indemnitor remains liable to fully indemnify Indemnitee.

2. **EXPENSES; INDEMNIFICATION PROCEDURE.**

2.1. **Right of Claimant to Bring Suit.** If a claim under Section 1 hereof is not paid in full by Indemnitors within sixty days after a written claim has been received by the Indemnitors, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty days, Indemnitee may, but need not, at any time thereafter bring suit against Indemnitors to recover the unpaid amount of the claim. If successful in any

such suit, or in a suit brought by the Company to recover an advancement of expenses pursuant to the terms of an undertaking, Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit; provided, however, that if it shall be determined in any such suit that Indemnitee is entitled to receive part but not all of the indemnification or advancement of expenses sought, the expenses incurred by Indemnitee in connection with such suit shall be appropriately prorated. Indemnitee shall be presumed to be entitled to indemnification under this Agreement upon submission of a written claim (and, in an action brought to enforce a claim for an advancement of expenses, where the required undertaking has been tendered to the Company and any other action required by the Statute has been taken), and thereafter the Company shall have the burden of proof to overcome the presumption that Indemnitee is not so entitled. Neither the failure of the Company (including its Board of Directors, independent legal counsel or its members) to have made a determination prior to the commencement of such suit that indemnification of Indemnitee is proper in the circumstances, nor an actual determination by the Company (including its Board of Directors, independent legal counsel or its members) that Indemnitee is not entitled to indemnification, shall be a defense to the suit or create a presumption that Indemnitee is not so entitled.

2.2. **Notice/Cooperation by Indemnitee**. As a condition precedent to Indemnitee's right to be indemnified under this Agreement, Indemnitee shall give the Indemnitors notice in writing as soon as practicable of any claim made against Indemnitee for which indemnification will or could be sought under this Agreement. In addition, Indemnitee shall give the Company such information and cooperation as it may reasonably require and as shall be within Indemnitee's power.

2.3. **Notice to Insurers**. If, at the time of the receipt of a notice of a claim pursuant to Section 2.2 hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such proceeding, in accordance with the terms of such policies.

2.4. **Selection of Counsel**. In the event the Indemnitors or either of them shall be obligated under Section 2.1 hereof to pay the expenses of a proceeding against Indemnitee, the Indemnitor so paying shall be entitled to assume the defense of such proceeding, with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of its election so to do. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Indemnitors, the Indemnitors will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same proceeding, provided that (i) Indemnitee shall have the right to employ his or her counsel in any such proceeding at Indemnitee's expense and (ii) if (A) the employment of counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Indemnitors, or either of them, and Indemnitee in the conduct of any such defense, or (C) the Indemnitors shall not, in fact, have employed counsel

158128648.1

to assume the defense of such proceeding, then the fees and expenses of Indemnitee's counsel shall be at the expense of the Indemnitors.

3. **ADDITIONAL INDEMNIFICATION RIGHTS; NONEXCLUSIVITY.**

3.1. **Scope.** Notwithstanding any other provision of this Agreement, Indemnitors hereby agree to indemnify Indemnitee to the full extent permitted by law, notwithstanding that such indemnification is not specifically authorized by this Agreement, the Company's Certificate of Formation, the Company's Bylaws, any statute, or otherwise. In the event of any changes, after the date of this Agreement, in any applicable law, statute, or rule which expands the right of a Washington limited liability company to indemnify a member of its board of directors or an officer or expands the right of a Washington individual to indemnify another individual, such changes shall be within the purview of Indemnitee's rights and the Indemnitors' obligations under this Agreement. In the event of any change in any applicable law, statute, or rule which narrows the right of a Washington limited liability company to indemnify a member of its board of directors or an officer, or narrows the right of a Washington individual to indemnify another individual, such changes, to the extent not otherwise required by such law, statute, or rule to be applied to this Agreement shall have no effect on this Agreement or the parties' rights and obligations hereunder.

3.2. **Nonexclusivity.** The indemnification provided by this Agreement shall not be deemed exclusive of any rights to which Indemnitee may be entitled under the Company's Certificate of Formation, its Bylaws, any agreement, any vote of its members or disinterested directors, the Statute, or otherwise, both as to action in Indemnitee's official capacity and as to action in another capacity while holding such office.

4. **MUTUAL ACKNOWLEDGMENT.** Both Indemnitors and Indemnitee acknowledge that, in certain instances, federal law or public policy may override applicable state law and prohibit the Company from indemnifying its directors and officers under this Agreement or otherwise. For example, federal legislation prohibits indemnification for certain ERISA violations.

5. **DIRECTORS' AND OFFICERS' LIABILITY INSURANCE.** The Company shall, from time to time, make the good faith determination whether or not it is practicable for the Company to obtain and maintain a policy or policies of insurance with reputable insurance companies providing the directors and officers with coverage for losses from wrongful acts, or to ensure the Company's performance of its indemnification obligations under this Agreement. Among other considerations, the Company will weigh the costs of obtaining such insurance coverage against the protection afforded by such coverage. In all policies of directors' and officers' liability insurance so obtained, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are accorded to the most favorably insured of the Company's directors, if Indemnitee is a director, or of the Company's officers, if Indemnitee is not a director of the Company but is an officer. Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain such insurance if the Company determines in good faith that such insurance is not reasonably available, the premium costs for such insurance are disproportionate to the amount of coverage provided, the coverage

158128648.1

provided by such insurance is limited by exclusions so as to provide an insufficient benefit, or Indemnitee is covered by similar insurance maintained by a parent or subsidiary of the Company.

6.     **SEVERABILITY.** Nothing in this Agreement is intended to require or shall be construed as requiring the Indemnitors and each of them to do or fail to do any act in violation of applicable law. Brettler's or the Company's inability, pursuant to court order, to perform their obligations under this Agreement shall not constitute a breach of this Agreement. Should the provisions of this Agreement or any portion hereof be invalidated on any ground by any court of competent jurisdiction, then Company or Brettler, as the case may be, shall nevertheless indemnify Indemnitee to the full extent permitted by any applicable portion of this Agreement that shall not have been invalidated, and the balance of this Agreement not so invalidated shall be enforceable in accordance with its terms.

7.     **EXCEPTIONS.** Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement with respect to the following:

7.1.    **Claims Initiated by Indemnitee.** To indemnify or advance expenses to Indemnitee with respect to proceedings or claims initiated or brought voluntarily by Indemnitee and not by way of defense, unless Board of Directors approval is obtained as provided in Section 1, and except with respect to proceedings brought to establish or enforce a right to indemnification under this Agreement or any other statute or law or as otherwise required under the Statute.

7.2.    **Lack of Good Faith.** To indemnify Indemnitee for any expenses incurred by Indemnitee with respect to any proceeding instituted by Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous.

7.3.    **Insured Claim** To indemnify Indemnitee for expenses or liabilities of any type whatsoever (including, but not limited to, judgments, fines, ERISA excise taxes or penalties, and amounts paid in settlement) which have been paid directly to Indemnitee by an insurance carrier under a policy of officers' and directors' liability insurance maintained by the Company.

8.     **PERSONS SERVING OTHER ENTITIES.** If Indemnitee, provides services to Car Toys under the Shared Services Agreement, Indemnitee shall be entitled to the indemnification and advancement of expenses provisions of Section 1 of this Agreement.

9.     **SETTLEMENT.** Indemnitors shall have no obligation to indemnify Indemnitee under this Agreement for any amounts paid in settlement of any action, suit or proceeding effected without the Indemnitors' prior written consent. The Company shall not settle any claim in any manner which would impose any fine or any obligation on Indemnitee without Brettler Indemnitee's prior written consent. Neither Indemnitors nor Indemnitee shall unreasonably withhold their respective consents to any proposed settlement.

158128648.1

10. **SUBROGATION AND CONTRIBUTION.** In the event of payment under this Agreement, the Indemnitors shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all documents required and shall do all acts that may be necessary to secure such rights and to enable the Indemnitors to effectively bring suit to enforce such rights. The Indemnitors and Indemnitee hereby agree that Company's obligation to Indemnitee is primary and only if the Company is unable to advance any amounts it is obligated to advance or pay under this Agreement, will Brettler have an obligation to advance or pay such amount. If Brettler advances expenses under section 2.1, pays or advances any insurance premiums for D&O coverage or otherwise incurs any expense in connection with this Agreement, including his reasonable attorney fees, he shall have a right of full reimbursement from the Company with respect to any advance or payment and he shall also be subrogated to the rights of the Company to the extent of any such advance or payment. For the avoidance of doubt, the Company shall have no right of contribution or reimbursement against Brettler for any amounts which it is obligated to and does advance under this Agreement.

11. **COUNTERPARTS.** This Agreement may be executed in counterparts, each of which shall constitute an original.

12. **ATTORNEYS' FEES.** In the event that any action is instituted by Indemnitee under this Agreement to enforce or interpret any of the terms hereof, Indemnitee shall be entitled to be paid all court costs and expenses, including reasonable attorneys' fees, incurred by Indemnitee with respect to such action, unless, as a part of such action, a court of competent jurisdiction determines that each of the material asserts made by Indemnitee as a basis for such action was not made in good faith or was frivolous. In the event of an action instituted by or in the name of the Company under this Agreement or to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all court costs and expenses, including attorneys' fees, incurred by Indemnitee in defense of such action (including with respect to Indemnitee's counterclaims and cross-claims made in such action), unless as a part of such action the court determines that each of Indemnitee's material defenses to such action was made in bad faith or was frivolous.

13. **NOTICE.** All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) if delivered by hand and receipted for by the party addressed, on the date of such receipt, or (ii) if mailed by domestic certified or registered mail with postage prepaid, on the third business day after the date postmarked. Addresses for notice to either party are as shown on the signature page of this Agreement, or as subsequently modified by written notice.

14. **CONSENT TO JURISDICTION.** Indemnitor and Indemnitee each hereby irrevocably consent to the jurisdiction of the courts of the State of Washington for all purposes in connection with any action or proceeding which arises out of or relates to this Agreement and agree that any action instituted under this Agreement shall be brought only in the state courts of the state of Washington.

158128648.1

*[SIGNATURE PAGE TO INDEMNIFICATION AGREEMENT]*

**INDEMNITOR:**

DAN BRETTLER

Address:
4124 55th Avenue East
Seattle, WA 98105

**WIRELESS ADVOCATES, LLC,**
a Washington limited liability company

By:
Name: DAN BRETTLER
Title: Chairman and Chief Executive Officer

Address:
400 Fairview Ave N, Suite 1000
Seattle, WA 98109

AGREED TO AND ACCEPTED:

**INDEMNITEE:**

Kimberly Nelson

Address:
2036 218th PL NE
Sammamish, WA 98074

- 8 -

15.    **CHOICE OF LAW**.  This Agreement shall be governed by and its provisions construed in accordance with the laws of the state of Washington, as applied to contracts between Washington residents entered into and to be performed entirely within Washington.

The parties have executed this Agreement as of the date first set forth above.

*[SIGNATURE PAGE FOLLOWS]*

158128648.1

# INDEMNIFICATION AGREEMENT

This Indemnification Agreement (*"Agreement"*) is made and entered into as of September 12, 2022 by and between Dan Brettler, (*"Brettler"*), an individual and Wireless Advocates, LLC, a Washington limited lability (the *"Company"* and collectively with Brettler the *"Indemnitors"*), and Angela Peterson, an individual (*"Indemnitee"*).

## RECITALS

A. Indemnitee is currently serving as an officer of the Company and in such capacity is performing valuable services for the Company.

B. Brettler is the CEO of the Company and the largest equity holder.

C. The members of the Company have adopted Bylaws (the *"Bylaws"*) providing the indemnification of the directors and officers of the Company to the full extent permitted under Washington law.

D. The Bylaws and the Washington Limited Liability Company Act (the *"Statute"*) specifically provide that they are not exclusive, and thereby contemplate that contracts may be entered into between the Company and the members of its Board of Directors and its officers with respect to indemnification of such directors and officers.

E. The Indemnitors and Indemnitee recognize the increasing difficulty in obtaining directors' and officers' liability insurance, the significant increases in the cost of such insurance and the general reduction in the coverage of such insurance.

F. The Indemnitors and Indemnitee further recognize the substantial increase in litigation subjecting officers and directors to expensive litigation risks at the same time that such liability insurance has been severely limited.

G. Indemnitee does not regard the current protection available as adequate given the present circumstances, and Indemnitee may not be willing to serve as an officer without adequate protection.

H. The Company desires to retain the services of highly qualified individuals, such as Indemnitee, to serve as officers and directors of the Company and to indemnify its officers so as to provide them with the maximum protection permitted by law.

I. In order to induce Indemnitee to continue to serve as an officer of the Company and in consideration for her continued service, Indemnitors have determined and agreed to enter into this Agreement with Indemnitee.

158128648.1

<u>AGREEMENT</u>

In consideration of the recitals above and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1.      **RIGHT TO INDEMNIFICATION**.  Indemnitors shall indemnify Indemnitee if Indemnitee was or is made a party or is threatened to be made a party to or is otherwise involved (including, without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal (hereinafter a "proceeding"), by reason of the fact that Indemnitee is or was a director or officer of the Company or that, while serving as a director or officer of the Company, Indemnitee is or was providing services to Car Toys under the Shared Services Agreement between the Company and Car Toys, shall be indemnified and held harmless by the Indemnitors against all expense, liability and loss (including attorneys' fees, judgment, fines, ERISA excise taxes or penalties and amounts paid in settlement) actually and reasonably incurred or suffered by Indemnitee (hereinafter "expenses") in connection therewith; provided, however, that (a) the Indemnitors shall not indemnify Indemnitee from or on account of any act or omission of Indemnitee to the extent indemnification for such act or omission is specifically prohibited by RCW 25.15.041 or any successor provision of the Statute; and (b) except as provided in Section 2.1 hereof with respect to proceedings seeking to enforce rights to indemnification, Indemnitors shall indemnify Indemnitee in connection with a proceeding (or part thereof) initiated by Indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Company.  Such indemnification shall continue as to Indemnitee after Indemnitee has ceased to be a director, officer, employee or agent and shall inure to the benefit of Indemnitee's heirs, successors and administrators.  The right to indemnification conferred in this Section 1 shall include the right to be paid by the Indemnitors the expenses incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that an advancement of expenses incurred by Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Company of an undertaking (hereinafter an "undertaking"), by or on behalf of Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that Indemnitee is not entitled to be indemnified for such expenses under this Section 1 or otherwise and upon the taking of such other action, if any, as may be required by the Statute.  The requirement to indemnify Indemnitee under this Agreement is joint and several as between the Indemnitors.  If either Indemnitor is unable or unwilling to fulfill its obligations hereunder, the other Indemnitor remains liable to fully indemnify Indemnitee.

2.      **EXPENSES; INDEMNIFICATION PROCEDURE.**

2.1.    **Right of Claimant to Bring Suit.**  If a claim under Section 1 hereof is not paid in full by Indemnitors within sixty days after a written claim has been received by the Indemnitors, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty days, Indemnitee may, but need not, at any time thereafter bring suit against Indemnitors to recover the unpaid amount of the claim.  If successful in any

- 2 –

such suit, or in a suit brought by the Company to recover an advancement of expenses pursuant to the terms of an undertaking, Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit; provided, however, that if it shall be determined in any such suit that Indemnitee is entitled to receive part but not all of the indemnification or advancement of expenses sought, the expenses incurred by Indemnitee in connection with such suit shall be appropriately prorated. Indemnitee shall be presumed to be entitled to indemnification under this Agreement upon submission of a written claim (and, in an action brought to enforce a claim for an advancement of expenses, where the required undertaking has been tendered to the Company and any other action required by the Statute has been taken), and thereafter the Company shall have the burden of proof to overcome the presumption that Indemnitee is not so entitled. Neither the failure of the Company (including its Board of Directors, independent legal counsel or its members) to have made a determination prior to the commencement of such suit that indemnification of Indemnitee is proper in the circumstances, nor an actual determination by the Company (including its Board of Directors, independent legal counsel or its members) that Indemnitee is not entitled to indemnification, shall be a defense to the suit or create a presumption that Indemnitee is not so entitled.

2.2. **Notice/Cooperation by Indemnitee.** As a condition precedent to Indemnitee's right to be indemnified under this Agreement, Indemnitee shall give the Indemnitors notice in writing as soon as practicable of any claim made against Indemnitee for which indemnification will or could be sought under this Agreement. In addition, Indemnitee shall give the Company such information and cooperation as it may reasonably require and as shall be within Indemnitee's power.

2.3. **Notice to Insurers.** If, at the time of the receipt of a notice of a claim pursuant to Section 2.2 hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such proceeding, in accordance with the terms of such policies.

2.4. **Selection of Counsel.** In the event the Indemnitors or either of them shall be obligated under Section 2.1 hereof to pay the expenses of a proceeding against Indemnitee, the Indemnitor so paying shall be entitled to assume the defense of such proceeding, with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of its election so to do. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Indemnitors, the Indemnitors will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same proceeding, provided that (i) Indemnitee shall have the right to employ his or her counsel in any such proceeding at Indemnitee's expense and (ii) if (A) the employment of counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Indemnitors, or either of them, and Indemnitee in the conduct of any such defense, or (C) the Indemnitors shall not, in fact, have employed counsel

– 3 –

to assume the defense of such proceeding, then the fees and expenses of Indemnitee's counsel shall be at the expense of the Indemnitors.

3.    **ADDITIONAL INDEMNIFICATION RIGHTS; NONEXCLUSIVITY.**

3.1.    **Scope.**    Notwithstanding any other provision of this Agreement, Indemnitors hereby agree to indemnify Indemnitee to the full extent permitted by law, notwithstanding that such indemnification is not specifically authorized by this Agreement, the Company's Certificate of Formation, the Company's Bylaws, any statute, or otherwise. In the event of any changes, after the date of this Agreement, in any applicable law, statute, or rule which expands the right of a Washington limited liability company to indemnify a member of its board of directors or an officer or expands the right of a Washington individual to indemnify another individual, such changes shall be within the purview of Indemnitee's rights and the Indemnitors' obligations under this Agreement. In the event of any change in any applicable law, statute, or rule which narrows the right of a Washington limited liability company to indemnify a member of its board of directors or an officer, or narrows the right of a Washington individual to indemnify another individual, such changes, to the extent not otherwise required by such law, statute, or rule to be applied to this Agreement shall have no effect on this Agreement or the parties' rights and obligations hereunder.

3.2.    **Nonexclusivity.**    The indemnification provided by this Agreement shall not be deemed exclusive of any rights to which Indemnitee may be entitled under the Company's Certificate of Formation, its Bylaws, any agreement, any vote of its members or disinterested directors, the Statute, or otherwise, both as to action in Indemnitee's official capacity and as to action in another capacity while holding such office.

4.    **MUTUAL ACKNOWLEDGMENT.**    Both Indemnitors and Indemnitee acknowledge that, in certain instances, federal law or public policy may override applicable state law and prohibit the Company from indemnifying its directors and officers under this Agreement or otherwise. For example, federal legislation prohibits indemnification for certain ERISA violations.

5.    **DIRECTORS' AND OFFICERS' LIABILITY INSURANCE.**    The Company shall, from time to time, make the good faith determination whether or not it is practicable for the Company to obtain and maintain a policy or policies of insurance with reputable insurance companies providing the directors and officers with coverage for losses from wrongful acts, or to ensure the Company's performance of its indemnification obligations under this Agreement. Among other considerations, the Company will weigh the costs of obtaining such insurance coverage against the protection afforded by such coverage. In all policies of directors' and officers' liability insurance so obtained, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are accorded to the most favorably insured of the Company's directors, if Indemnitee is a director, or of the Company's officers, if Indemnitee is not a director of the Company but is an officer. Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain such insurance if the Company determines in good faith that such insurance is not reasonably available, the premium costs for such insurance are disproportionate to the amount of coverage provided, the coverage

158128648.1

provided by such insurance is limited by exclusions so as to provide an insufficient benefit, or Indemnitee is covered by similar insurance maintained by a parent or subsidiary of the Company.

6. **SEVERABILITY**. Nothing in this Agreement is intended to require or shall be construed as requiring the Indemnitors and each of them to do or fail to do any act in violation of applicable law. Brettler's or the Company's inability, pursuant to court order, to perform their obligations under this Agreement shall not constitute a breach of this Agreement. Should the provisions of this Agreement or any portion hereof be invalidated on any ground by any court of competent jurisdiction, then Company or Brettler, as the case may be, shall nevertheless indemnify Indemnitee to the full extent permitted by any applicable portion of this Agreement that shall not have been invalidated, and the balance of this Agreement not so invalidated shall be enforceable in accordance with its terms.

7. **EXCEPTIONS**. Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement with respect to the following:

7.1. **Claims Initiated by Indemnitee**. To indemnify or advance expenses to Indemnitee with respect to proceedings or claims initiated or brought voluntarily by Indemnitee and not by way of defense, unless Board of Directors approval is obtained as provided in Section 1, and except with respect to proceedings brought to establish or enforce a right to indemnification under this Agreement or any other statute or law or as otherwise required under the Statute.

7.2. **Lack of Good Faith**. To indemnify Indemnitee for any expenses incurred by Indemnitee with respect to any proceeding instituted by Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous.

7.3. **Insured Claim** To indemnify Indemnitee for expenses or liabilities of any type whatsoever (including, but not limited to, judgments, fines, ERISA excise taxes or penalties, and amounts paid in settlement) which have been paid directly to Indemnitee by an insurance carrier under a policy of officers' and directors' liability insurance maintained by the Company.

8. **PERSONS SERVING OTHER ENTITIES**. If Indemnitee, provides services to Car Toys under the Shared Services Agreement, Indemnitee shall be entitled to the indemnification and advancement of expenses provisions of Section 1 of this Agreement.

9. **SETTLEMENT**. Indemnitors shall have no obligation to indemnify Indemnitee under this Agreement for any amounts paid in settlement of any action, suit or proceeding effected without the Indemnitors' prior written consent. The Company shall not settle any claim in any manner which would impose any fine or any obligation on Indemnitee without Brettler Indemnitee's prior written consent. Neither Indemnitors nor Indemnitee shall unreasonably withhold their respective consents to any proposed settlement.

**10.** **SUBROGATION AND CONTRIBUTION.** In the event of payment under this Agreement, the Indemnitors shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all documents required and shall do all acts that may be necessary to secure such rights and to enable the Indemnitors to effectively bring suit to enforce such rights. The Indemnitors and Indemnitee hereby agree that Company's obligation to Indemnitee is primary and only if the Company is unable to advance any amounts it is obligated to advance or pay under this Agreement, will Brettler have an obligation to advance or pay such amount. If Brettler advances expenses under section 2.1, pays or advances any insurance premiums for D&O coverage or otherwise incurs any expense in connection with this Agreement, including his reasonable attorney fees, he shall have a right of full reimbursement from the Company with respect to any advance or payment and he shall also be subrogated to the rights of the Company to the extent of any such advance or payment. For the avoidance of doubt, the Company shall have no right of contribution or reimbursement against Brettler for any amounts which it is obligated to and does advance under this Agreement.

11. **COUNTERPARTS**. This Agreement may be executed in counterparts, each of which shall constitute an original.

12. **ATTORNEYS' FEES.** In the event that any action is instituted by Indemnitee under this Agreement to enforce or interpret any of the terms hereof, Indemnitee shall be entitled to be paid all court costs and expenses, including reasonable attorneys' fees, incurred by Indemnitee with respect to such action, unless, as a part of such action, a court of competent jurisdiction determines that each of the material asserts made by Indemnitee as a basis for such action was not made in good faith or was frivolous. In the event of an action instituted by or in the name of the Company under this Agreement or to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all court costs and expenses, including attorneys' fees, incurred by Indemnitee in defense of such action (including with respect to Indemnitee's counterclaims and cross-claims made in such action), unless as a part of such action the court determines that each of Indemnitee's material defenses to such action was made in bad faith or was frivolous.

13. **NOTICE.** All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) if delivered by hand and receipted for by the party addressed, on the date of such receipt, or (ii) if mailed by domestic certified or registered mail with postage prepaid, on the third business day after the date postmarked. Addresses for notice to either party are as shown on the signature page of this Agreement, or as subsequently modified by written notice.

14. **CONSENT TO JURISDICTION.** Indemnitor and Indemnitee each hereby irrevocably consent to the jurisdiction of the courts of the State of Washington for all purposes in connection with any action or proceeding which arises out of or relates to this Agreement and agree that any action instituted under this Agreement shall be brought only in the state courts of the state of Washington.

158128648.1

15.     **CHOICE OF LAW.** This Agreement shall be governed by and its provisions construed in accordance with the laws of the state of Washington, as applied to contracts between Washington residents entered into and to be performed entirely within Washington.

The parties have executed this Agreement as of the date first set forth above.

*[SIGNATURE PAGE FOLLOWS]*

158128648.1

*[SIGNATURE PAGE TO INDEMNIFICATION AGREEMENT]*

**INDEMNITOR:**

_____
DAN BRETTLER

Address:
4124 55th Avenue East
Seattle, WA 98105

**WIRELESS ADVOCATES, LLC,**
a Washington limited liability company

By: _____
Name: DAN BRETTLER
Title:   Chairman and Chief Executive Officer

Address:
400 Fairview Ave N, Suite 1000
Seattle, WA 98109

AGREED TO AND ACCEPTED:

**INDEMNITEE:**

_____
Angela Peterson

Address:
7505 SE 40th Street
Mercer Island, WA  98040

- 8 -